1

2  **ADVOCATES FOR FAITH & FREEDOM**
JENNIFER L. MONK, State Bar No. 245512

3  ROBERT H. TYLER, State Bar No. 179572
24910 Las Brisas Road, Suite 110

4  Murrieta, CA 92562
Tel: (951) 304-7583

5  Fax: (951) 600-4996
jmonk@faith-freedom.com

6

7

8

9

10

11

12

13

14                    U.S. District Court for the
                   Central District of California

15

16  **VICTOR J. ROGERS,**                )  **CV:09-01289 VBF (JCx)**
                **Plaintiff,**           )  FIRST

17       **vs.**                         )  **AMENDED COMPLAINT**
                                         )

18  **SECRETARY OF THE NAVY,**           )
    **and BOARD FOR CORRECTION**         )

19  **OF NAVAL RECORDS,**                )
                **Defendants.**          )

20                                       )
                                         )

21                                       )

22

23                          **INTRODUCTION**

24

25  1.    Plaintiff, Victor J. Rogers, is a World War II U.S. Marine Corps veteran who

26  was wounded in action during the battle for Peleliu in the Pacific Theater.

27  2.    Mr. Rogers petitioned to the Board for Correction of Naval Records (BCNR)

28  (representing the U.S. Marine Corps) for a correction of his military record to

**AMERICAN CENTER FOR
LAW & JUSTICE**
ERIK M. ZIMMERMAN*
1000 Regent University Drive
Virginia Beach, VA 23464
Tel: (757) 226-2489
Fax: (757) 226-2836

CARLY F. GAMMILL*
5214 Maryland Way, Suite 402
Brentwood, TN 37027
Tel: (615) 376-2600
Fax: (615) 345-6009

* Pro Hac Vice Applications Filed
  Herewith

2009 JUN 24 PM 1:07
CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

FILED

- 1 -

reflect that he is entitled to receive the Purple Heart Medal for his wounds in action, based on records surviving from his service years.

3.     On October 1, 2008, the BCNR issued a final agency decision denying Plaintiff's petition for relief.

4.     Plaintiff seeks this Court's review of this final agency decision under the Administrative Procedures Act, on the basis that the decision was arbitrary, capricious, an abuse of discretion, and / or contrary to law.

## <u>JURISDICTION</u>

5.     This action arises under the Administrative Procedures Act (APA), 5 U.S.C. § 702 *et seq*.

6.     This court has jurisdiction pursuant to 28 U.S.C. § 1331, the Federal Question Statute, and is empowered by the APA to review final agency administrative decisions.

7.     Plaintiff seeks review of the BCNR decision letter of October 1, 2008, denying Plaintiff's petition to the BCNR for a correction of his service record and refusing to confirm his eligibility for the Purple Heart award for wounds received in action against the Japanese during the World War II Battle of Peleliu.

8.     This decision, confirmed by a Headquarters, U.S. Marine Corps (USMC) letter of December 18, 2008, incorporated by reference all previous USMC

correspondence and opinions exchanged between Plaintiff, the BCNR, and the USMC, and affirmed that the BCNR action was final.

9.     Accordingly, Plaintiff has exhausted his administrative remedies.

10.    This APA action was filed within six years of the final agency decision, as required by 28 U.S.C. § 2401(a).

## **VENUE**

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this action does not involve any real property, and at all times relevant to Plaintiff's correspondence with the BCNR, he has been a resident of Victorville, California, within the Central District of California.

## **PARTIES**

12.    Plaintiff, Victor J. Rogers, is a World War II U.S. Marine Corps veteran wounded in action during the battle for Peleliu in the Pacific Theater, who has been unlawfully denied relief from the BCNR.

13.    Defendant, the Board for Correction of Naval Records, is an organization within the Department of the Navy, Department of Defense, authorized to review petitions for correction of service records from former and present Marine Corps and Navy members, and empowered to order appropriate corrections to those records.

14.    Defendant, the Secretary of the Navy, is the senior official in the Department of the Navy and, along with his designee, the Assistant Secretary of the Navy for Manpower & Reserve Affairs, is responsible for the BCNR's performance of its ministerial and discretionary functions.

## FACTS

### Plaintiff's World War II Experience

15.    Plaintiff's Exhibit (PE) 1 describes Plaintiff's war experiences.[1]

16.    Plaintiff enlisted in the Marine Corps on June 23, 1943 at Rochester, New York, and was trained as a basic infantryman.  PE 1

17.    Plaintiff was sent to the Pacific Theater on April 8, 1944, eventually joining the First Battalion, Seventh Marine Regiment, First Marine Division, performing amphibious operations training around Pavavu and Guadalcanal.  PE 1

18.    Embarking aboard transports on September 14, 1944, Plaintiff's Division found out they were to attack the atoll of Peleliu, in the Palau Island chain. PE 1

19.    Leaving the troop transports in "amtracs," the 7th Marines led the way to the landing beaches under terrible shell fire.  PE 1

20.    Immediately upon reaching the beach, Plaintiff's squad jumped out of the amtrac, just before it was hit by enemy fire and exploded.  PE 1

---

[1] PE's are taken from the Administrative Record, and are provided only to substantiate the proffered facts.

- 4 -

21.    The Japanese defenders were well prepared and the landing beach turned into a fire-swept hell for the Marines; the Japanese engineered the island so every yard was covered with fire.  PE 1

22.    Lieutenant General Roy Geiger, USMC, later stated that Peleliu was the toughest battle of the entire Pacific war, and future Marine Corps Commandant Clifton Cates said it was one of the most vicious and stubbornly contested battles of the war.  PE 1

23.    The result appeared to be in doubt as hundreds of Marine dead piled up on the beaches, but the Marines pushed inland, braving unrelenting shell and machine gun fire.  PE 1

24.    The weather added greatly to their misery and exhaustion from the shelling and machine guns rounds.  PE 1

25.    There was no cover, and little water, because any effort to find water increased the already high chance of being wounded or killed.  PE 1

26.    On the fourth day of non-stop, heavy combat, Plaintiff was ordered to gather a patrol to probe Japanese lines.  PE 1

27.    As the patrol awaited instructions, a Japanese shell landed among them, killing some, and wounding others, including Plaintiff.  PE 1

28.    Other Marines told Plaintiff he was tossed in the air and landed on his side unconscious (his shoulder was under treatment until the 1990s).  PE 1

29.    Plaintiff was informed by his fellow Marines that he was "out cold and bleeding from the nose, ears, and mouth."  PE 1

30.    Plaintiff was taken to the nearby "Battalion Aid Station," where a doctor provided first aid and ordered Plaintiff evacuated to the beach medical station.  PE 1; PE 3

31.    Plaintiff has no real personal memory of the evacuation, but his records indicate that Plaintiff was further evacuated to a hospital ship from the beach medical treatment point.  PE 1; PE 3; PE 4; PE 5

32.    PE 2 is an article describing the casualties of the Battle of Peleliu.

33.    The author of PE 2 is a war correspondent who was at Peleliu and observed the battle firsthand during the time Plaintiff was fighting there.

34.    PE 3, a medical record of Plaintiff's made at the beach evacuation point, states that he was "wounded in action."

35.    PE 3 further states, "First aid treatment given in the field [the Battalion Aid Station].  No record of treatment available at this [beach medical] activity."

36.    The record demonstrates that Plaintiff was transferred to the U.S.S. Leedstown "for further treatment and disposition."

37.    PE 3 also includes the notation "Heat exhaustion."

38.    Plaintiff remembers later waking up on a hospital ship, recalls a corpsman or doctor looking at him and, seeing no open wounds, moving on.

39.    That is all Plaintiff remembers until after the ship departed Peleliu.   PE 1

40.    PE 4 shows that on the day Plaintiff was evacuated from the beach, September 18, 1944, a shipboard doctor on the Leedstown crossed out the word "wounded" and substituted the word "injured."

41.    The same record notes that Plaintiff was returned to duty on September 24, 1944. PE 4

42.    The record at PE 5, however, demonstrates that after he was evacuated from Peleliu to the hospital ship USS Leedstown on September 18, 1944, Plaintiff was then transferred the same day to the USS Samaritan and subsequently arrived at a hospital in the Russell Islands for medical treatment on September 28, 1944.

43.    Yet another record lists Plaintiff as having been "[h]ospitalized at 46th USN CB Dispensary from 9-25-44 to 9-29-44." PE 5 (p.2).

44.    Certainly there is some discrepancy among these records with regard to the specific date on which Plaintiff was returned to duty.

45.    What is clear, however, is that, rather than being returned to duty after treatment for mere heat exhaustion, medical authorities discovered on September 18, 1944 that Plaintiff was suffering from a concussion and kept him hospitalized for 11 more days.  PE 5

46.    PE 6 expressly states that the "[p]receding entries in [Plaintiff's] health record" were "evaluated" by Lt. Commander H.E. Fraser on June 29, 1945.

47.   The entries then available to Fraser indicated that Plaintiff had in fact "suffered [a] concussion reaction at Peleliu . . . ."

48.   PE 4, which shows a hand annotated change of "wounded" to "injured" and treatment only for heat exhaustion, is therefore inaccurate or, at a minimum, incomplete, in that the overall record proves Plaintiff was further diagnosed with a concussion and kept in treatment for the concussion eleven more days before being released to return to duty.

49.   Plaintiff further recalls that the doctors told him he had been diagnosed with a severe concussion, and he remembers the awful headaches, difficulty concentrating, ringing ears, and a painful shoulder which hurts to this day.  PE 1

50.   Few combat area records survived into Plaintiff's post war records, and today there is only one surviving record from the nearly two weeks' worth of hospital ship and shore hospital treatment following Plaintiff's evacuation from Peleliu. (PE 4)

51.   PE 18 expressly states with regard to Plaintiff's service record that "[d]ue to unavoidable war conditions, the foreign  . . . service shown in this skeleton service record book is incomplete."

52.   That the records reviewed by Lt. Commander Fraser are no longer available does not negate the fact, as noted by Fraser, that they contained the diagnosis that Plaintiff had suffered a concussion reaction at Peleliu.

53.    PE 7 is a copy of the original newspaper article Plaintiff's parents kept from the Rochester newspaper.

54.    PE 7 states, "Five Rochester service men were wounded in action, according to casualty reports received here today."

55.    PE 7 then reports that "Marine Pfc. Victor J. Rogers, 19 . . . was wounded in action in the Peleliu Islands in September."

56.    After fighting in the brutal Okinawa campaign for 47 straight days, surviving many near misses from shell and small weapons fire, but suffering no further wounds, Plaintiff was released from the Marine Corps on October 26, 1945. PE 8

**Earlier Procedural History**

57.    In 2001, having endured the after effects of heavy close combat since he left the Marine Corps, Plaintiff decided to review his war record for the sake of posterity.  PE 1

58.    He gained records from the military National Records Center and, aware of his advancing age and wishing to correct the record, petitioned the BCNR and Headquarters, U.S. Marine Corps (HQMC) to correct his service record.  PE 1

59.    Plaintiff stated he had been recommended by his company commander for a Bronze Star for valor on Okinawa, and further asked for a correction of records as to the Purple Heart Award after discovering the records he ordered from the

Department of the Navy did not state he was authorized the Award for his wound received at Peleliu.  PE 1

60.    On May 30, 2003, HQMC informed the BCNR that (1) the information submitted from Plaintiff's medical records could not be used to substantiate a Purple Heart Award; and (2) Plaintiff "did not show that the explosion was caused by enemy action."

61.    No authority was cited for these findings. PE 9

62.    PE 8 (p. 2) clearly states that Plaintiff's participation in the Battle of Peleliu was "against the enemy."

63.    Plaintiff continued to try various ways to communicate with the BCNR and HQMC that he had new evidence and disagreed with the legal interpretations offered by BCNR.

64.    On June 9, 2008 the BCNR again rejected his request for reconsideration, having never offered Plaintiff any information about how to seek higher level review of the decision.  PE 10

65.    BCNR acknowledged Plaintiff had offered new evidence, but labeled it as "not material."  PE 10

66.    On October 1, 2008, the BCNR issued a final agency decision denying Plaintiff's petition for relief.

### Case of Arthur "Earl" LeClerc

67.     On July 31, 2008, HQMC published an article from The Shelbyville News, of Indiana, entitled **"Always faithful,** *Veteran awarded Purple Heart after 63 years,"* about 84-year old former Marine enlisted man Arthur "Earl" LeClerc.  PE 11

68.     The article states that "Arthur 'Earl' LeClerc, 84, has received the Military Order of the Purple Heart award for injuries the corporal sustained in World War II more than 60 years ago during the Battle of Okinawa."  PE 11

69.     "He was wounded May 22, 1945, on Okinawa, where he and a fellow soldier and friend, Harry Lowe, who also survived, were thrown from a foxhole by the force of an artillery shell."  PE 11

70.     "LeClerc was left unconscious from a concussion blast, which causes a victim to bleed from the ears, nose and mouth without leaving a scratch on the body. PE 11

71.     "'I ended up in two or three hospitals,' he said. LeClerc was sent back to the United States, and he was discharged from military service on Oct. 30, 1945."  PE 11

72.     "The delay in receiving the Purple Heart award was partly because of disorganization on the part of the military at the time - many wounds were not

recorded, and hospital records were incomplete - and partly because LeClerc said

he was in no rush to receive it.

73.    "'It was my fault I didn't receive it sooner,' he said. LeClerc had been given

paperwork to complete that would have gotten him the Purple Heart earlier, but he

never got around to filling it out."  PE 11

74.    "LeClerc's youngest brother, Larry, contacted a distant family relative,

retired Brig. Gen. Dan Kuhn, who was once a commanding general of the First

Provincial [sic] Marine Brigade. 'He got this done,' LeClerc said."  PE 11

75.    "Kuhn wrote a letter to Marine Commandant Gen. James T. Conway, the

highest ranking officer in the U.S. Marine Corps, at the Pentagon, and he issued

the order to grant LeClerc the Purple Heart."  PE 11

76.    "Relatives in recent years had some difficulty obtaining the Purple Heart for

LeClerc since an official record of his wounds did not exist."  PE 11

77.    On November 7, 2008, Plaintiff wrote to the Commandant of the Marine

Corps, pointed out his situation was virtually the same as LeClerc's, except

Plaintiff had a surviving record specifically stating he had been treated for

concussion.  PE 11

78.    On December 18, 2008, HQMC responded that it had addressed Plaintiff's

position in its letter of May 30, 2003, reaffirmed that letter, and stated the BCNR

decision of October 1, 2008 was the last word on the matter.  PE 12

**Heat Exhaustion**

79.     Heat exhaustion occurs when a person cannot sweat enough to cool the body.

80.     It generally develops when a person is working or exercising in hot weather, sweats a lot, and does not drink enough liquids to replace those lost fluids.

81.     Heat exhaustion can be caused by loss of fluid (dehydration) or loss of electrolytes.  PE 13

82.     Symptoms of heat exhaustion include fatigue, weakness, headache, dizziness, or nausea, and the skin is pale, cool, and moist.

83.     Mild heat exhaustion does not cause a decrease in a person's mental alertness, but it may occasionally cause fainting.

84.     Cases of heat exhaustion usually can be treated without hospitalization.  PE 13

**Concussion**

85.     A concussion is a brain injury that is caused by a sudden blow to the head or to the body.

86.     The blow shakes the brain inside the skull, which temporarily prevents the brain from working normally.  PE 14

87.     Symptoms of a concussion range from mild to severe and can last for hours, days, weeks, or even months.   PE 14

88.    Symptoms of a concussion include:

    a.  Passing out.

    b.  Not being able to remember what happened after the injury.

    c.  Acting confused, asking the same question over and over, slurring words, or not being able to concentrate.

    d.  Feeling lightheaded, seeing "stars," having blurry vision, or experiencing ringing in the ears.

    e.  Not being able to stand or walk; or having coordination and balance problems.

    f.  Feeling nauseous or throwing up.  PE 14

89.    Occasionally, a person who has a more serious concussion develops new symptoms over time (post-concussive syndrome). Symptoms of post-concussive syndrome include:

    a.  Changes in ability to think, concentrate, or remember.

    b.  Headaches or blurry vision.

    c.  Changes in sleep patterns, such as not being able to sleep or sleeping all the time.

    d.  Changes in personality such as becoming angry or anxious for no clear reason.

e.  Dizziness, lightheadedness, or unsteadiness that makes standing or walking difficult.  PE 14

**Department of the Navy Purple Heart Medal Standards**

90.    The Purple Heart is awarded in the name of the President of the United States to any member of the Armed Forces of the United States who, while serving under competent authority in any capacity with one of the U.S. Armed Services after April 5, 1917, has been wounded or killed, or who has died after being wounded. PE 15

91.    By Executive Order 9277, dated December 3, 1942, the decoration was extended to be applicable to all services and the order required that regulations of the Services be uniform in application, as far as practicable. PE 15

92.    The Department of the Navy regulations governing the Purple Heart Medal are found in "SECNAV Instruction 1650.1H - NAVY AND MARINE CORPS AWARDS MANUAL."  PE 15

93.    Specific examples of services that warrant the Purple Heart are any action against an enemy of the United States; any action with an opposing armed force of a foreign country in which the Armed Forces of the United States are or have been engaged; while serving with friendly foreign forces engaged in an armed conflict against an opposing armed force in which the United States is not a belligerent

party; as a result of an act of any such enemy of opposing armed forces; or as the result of an act of any hostile foreign force. PE 15

94.    Injuries that justify the award of the Purple Heart include injury caused by enemy bullet, shrapnel, or other projectile created by enemy action; injury caused by enemy placed land mine, naval mine, or trap; injury caused by enemy released chemical, biological, or nuclear agent; injury caused by vehicle or aircraft accident resulting from enemy fire; and *concussion injuries caused as a result of enemy generated explosions*.

95.    Injuries or wounds that do not qualify for award of the Purple Heart include frostbite or trench foot injuries; heat stroke; food poisoning not caused by enemy agents; chemical, biological, or nuclear agents not released by the enemy; battle fatigue; disease not directly caused by enemy agents; accidents, to include explosive, aircraft, vehicular, and other accidental wounding not related to or caused by enemy action; self-inflicted wounds (*e.g.*, a soldier accidentally fires his own gun and the bullet strikes his leg), except when in the heat of battle, and not involving gross negligence; post-traumatic stress disorders; and jump injuries not caused by enemy action.

96.    Public Law 103-160, enacted November 30, 1993 and codified at 10 U.S.C. § 1129, authorizes the Purple Heart Award for wounds received as a result of friendly fire.

97.    There is no time limit for requesting award of the Purple Heart, and evidence may consist of either documents from personnel or medical records, or two or more sworn eye witness affidavits.  PE 15

## Procedural Background to Instant Complaint

98.    After a legal review of his record, Plaintiff identified several problems with the earlier BCNR and HQMC responses to his requests that they authorize him the Purple Heart.  PE 1

99.    On April 25, 2008, Plaintiff submitted his request for reconsideration.  PE 16

100.    On October 1, 2008, the BCNR issued the final agency decision, denying Plaintiff's request.  PE 17

101.    The response states that a three member panel of the BCNR, sitting in executive session, reconsidered Plaintiff's application and allegations of error and injustice.  PE 17

102.    The BCNR letter informed Plaintiff that his application for relief was denied because, "[a]fter careful and conscientious consideration of the entire record, the Board found that the evidence submitted failed to establish the existence of probable material error or injustice."  PE 17

103.    Plaintiff now comes before this honorable Court requesting that the Court set aside the BCNR decision.

## Administrative Procedures Act

104.    The Administrative Procedure Act (APA) sets up a process for the United States federal courts to directly review agency decisions.

105.    The APA applies to both the federal executive departments and the independent agencies.

106.    Under Section 704, the APA empowers the U.S. District Courts to review final agency actions.

107.    Section 706 permits the court to set aside an agency action that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law."

## Assignments of Error

### The BCNR's confused and biased review of the record was an arbitrary and capricious action.

108.    The BCNR claimed that it conducted a "careful and conscientious consideration of the entire record," as it is required by law to do.

109.    Immediately thereafter, however, in PE 17 paragraph four, the BCNR narrative convolutes events from Plaintiff's combat action on Peleliu and Okinawa, and the general approach indicates a capricious, biased intent to deny the petition, rather than careful consideration of the record.

110.    The record is neither lengthy nor complicated.

- 18 -

111.    Yet the BCNR mixed and matched evidence of events during the Okinawa battle with the Peleliu battle, and then drew conclusions based on that confused mix.

112.    In one example, the BCNR stated that Plaintiff became "hysterical" on Peleliu, and was then sent to the aid station.

113.    This is false.

114.    Plaintiff was thrown by an explosion and knocked unconscious, bleeding from the ears, nose, and mouth on Peleliu, whereupon he was transported, unconscious, to the battalion aid station.

115.    PE 3 substantiates that Plaintiff was treated in the field and makes no reference to Plaintiff's being "hysterical."

116.    Rather, it is PE 20, a medical record dated May 15, 1945, while Plaintiff was stationed *at Okinawa*, from which the BCNR erroneously concluded that Plaintiff became hysterical *at Peleliu.*

117.    None of Plaintiff's Peleliu records contain such information.

118.    The BCNR then labeled PE 3—which states plaintiff was "wounded in action"—as a "pre-printed entry," as if every person treated was wounded in action.

119.   BCNR dwelled at length on this point, insisting, with no evidence, that the form was preprinted, and speculating that it is "likely that numerous copies of those forms were prepared in anticipation of heavy action."

120.   BCNR's speculation is inconsistent with a close examination of this record.

     a.   First, PE 3 states, "No record of treatment available at this activity" and "Not seen by this activity" (the beach evacuation point), yet there is an entry with a diagnosis of "heat exhaustion" in a different type font than "wounded in action" and other entries on the document.

     b.   If Plaintiff was neither seen nor treated at the location at the beach evacuation point, it stands to reason that the diagnosis was inserted at a later time and different location.

     c.   Second, rather than there being the straw man "preprinted forms" BCNR alleges, what readily appears from a review of PE 3 is that two different typewriters were used on this record.

     d.   An examination of the words on PE 3 beginning with capital letters indicates that the typewriter used to *create* this record placed capital letters slightly above the rest of the line of text.

     e.   The words "HEAT EXHAUSTION" and "LEEDSTOWN" on PE 3, typed in all capital letters, are even slightly above the raised single capital letters and are clearly darker in appearance.

- 20 -

f.   For example, the entry indicating that Plaintiff was transferred to the Leedstown shows the letters "U.S.S." as slightly above the line of text, while the entry "LEEDSTOWN (APA-56)" is clearly darker than the rest of the typeface and appears above even the line on which the letters "U.S.S." appear.

g.   In addition, a comparison between the typeface of PE 3 and that of PE 4, a record created on board the Leedstown, yields a striking similarity.

h.   This circumstantial evidence strongly suggests that the "HEAT EXHAUSTION" entry added to PE 3 is from the same typewriter used on the USS Leedstown, where PE 4—also including a "heat exhaustion" entry—was created, and that the same incorrect (or incomplete) diagnosis entered on PE 4 was then typed onto PE 3 by the Leedstown clerks.

i.   While this scenario cannot be proven beyond all doubt, it is certainly based on much more conscientious scrutiny and analysis than that engaged in by the BCNR, which simply concluded without any rational explanation or supporting evidence that PE 3, indicating Plaintiff was "wounded in action," must have been a "preprinted form."

121.   Curiously, the BCNR then returned to medical records from Plaintiff's service at Okinawa and approvingly cited a document from that hospital stay which clearly misstated the time period Plaintiff fought on Peleliu, as 3 rather than 4 days, and clearly misquoted from PE 4. *See* PE 19.

- 21 -

122.    Even the BCNR decision acknowledged that the records contemporaneous with Plaintiff's Peleliu hospitalization (PE 3, 4) indicated that he was at least "injured."

123.    BCNR, however, then credited as persuasive a medical record—created almost a year later—which contradicted that very status by stating "Peleliu for 3 days – not injured."

124.    The BCNR's willingness to accept as accurate the clearly contradictory medical record at PE 19 is even more suspect given its dismissive treatment of the medical record at PE 6.

125.    PE 6 is roughly contemporaneous with PE 19, dated just one month prior.

126.    PE 6 demonstrates that Lt. Commander Fraser documented his review of the full medical record available to him at the time as showing Plaintiff's treatment for a concussion suffered at Peleliu.

127.    BCNR, however, discredited this record because it was a "belated entry . . . not made at the time of the alleged injury, and there is no indication in the record that [Plaintiff] required treatment by a medical officer at the time the alleged injury occurred."

128.    This finding suffers from several defects:

        a.    PE 6 clearly identifies itself as an evaluation of the "preceding entries in [Plaintiff's] health record" available to Fraser at that time;

b.    The record specifically states that Plaintiff suffered a concussion reaction at Peleliu;

c.    There was certainly evidence "in the record that [Plaintiff] required treatment by a medical officer at the time the alleged injury occurred," since PE 3 states that Plaintiff received first aid in the field and Plaintiff's records show that he was under treatment from the time of the injury on September 28, 1944, until 11 days later.

129.   In sum, BCNR rejected clear evidence of Plaintiff's wound while elevating every inference it could, no matter how slight or unsupported, as an indication that he was not wounded.

130.   This is arbitrary, capricious, and an abuse of the BCNR's discretionary duties.

131.   BCNR additionally rejected out-of-hand a corroborative account from the Rochester newspaper which states that "Marine Pfc. Victor J. Rogers, 19 . . . was wounded in action in the Peleliu Islands in September."  PE 7

**The BCNR's refusal to balance the medical
information, and mischaracterization of the medical record,
was an arbitrary and capricious action.**

132.   The BCNR ignored Plaintiff's evidence demonstrating that heat exhaustion merits perhaps out patient treatment for one day (and even in the extreme combat

conditions and heat in Peleliu, only merited one to two days), whereas Plaintiff was evacuated from Peleliu and was hospitalized for 11 days until September 29, 1944.

133.   Such long term treatment is indicated for a serious concussion, not heat exhaustion—a point BCNR never addressed.

134.   The BCNR did not attempt to balance, or even address, any of the apparent inconsistencies or contradictions among the various medical records but chose instead to credit some and discredit others with no sound justification for such a decision.

135.   In fact, the only rationale provided by the BCNR is itself entirely inconsistent with the BCNR's decision-making here, as the BCNR noted that a "belated entry" (PE 6) was not persuasive while simultaneously finding persuasive other records created at a time even further removed from Plaintiff's injury at Peleliu. PE 8; PE 19.

136.   Furthermore, with regard to PE 6, BCNR's decision indicates no attempt to understand where Doctor Fraser came up with the words "concussion reaction at Peleliu" while reviewing the "medical entries in health record," since the words appear nowhere else in current surviving records, and completely contradict the PE 4 annotation of mere heat exhaustion.

137.    Clearly the only existing review of the entire record at the time showed the reason Plaintiff was treated for nearly two weeks, after he was evacuated from Peleliu, was that he suffered a severe concussion.

138.    Despite the current absence of all but one medical record (PE 4) from the nearly two weeks' worth of hospital ship and shore hospital treatment following Plaintiff's evacuation from Peleliu, the BCNR clearly gave no weight to the fact that such medical records of Plaintiff's were still available to Lt. Commander Fraser in June 1945 and demonstrated that Plaintiff received a concussion at Peleliu and was treated for that wound.

139.    Even assuming the clerk aboard the Leedstown did not change PE 3 to match the "heat exhaustion" entry in PE 4, there is nonetheless no basis for BCNR to insist that the evacuation record's inclusion of both "wounded in action" and "heat exhaustion" must mean that the "heat exhaustion" entry excludes the "wounded" entry.

140.    These are not mutually exclusive determinations.

141.    Specifically, Plaintiff correctly points out that an eye witness—the war correspondent R.P. Martin of "Time" magazine—observed the notable prevalence of heat casualties on Peleliu when Plaintiff was wounded.  PE 2.

142.   Surely the incidence of heat exhaustion was much more pronounced for *wounded* Marines, due to the stress of their wounds, such that treatment for heat exhaustion was indicated in nearly every case.

143.   It is important to note that since heat exhaustion was prevalent at the time, it presumably was clear to the doctors at battalion aid stations and evacuation points that the prudent course was to make it a secondary diagnosis, needing immediate treatment, for all casualties, which tracks with the annotation on PE 3 of "wounded in action" *and* **"**heat exhaustion."

144.   Moreover, as R.P. Martin observed, the norm was for these heat exhaustion casualties to be returned to the units after one or two days of treatment, while Plaintiff was under hospital care for eleven more days and was evacuated far from the battlefield.

145.   BCNR exhibited the arbitrary and capricious nature of its decision by inexplicably stating that Plaintiff was not treated on the Peleliu battle field.

146.   Yet PE 3 clearly states that Plaintiff was "wounded in action" and "received first aid in the field."

147.   BCNR also made much of the crossing out of the word "wounded" and replacement with the word "injured" on PE 4, assuming without explanation that there is some "noteworthy" difference between the two for purposes of receiving the Purple Heart Award. (PE 17)

148.   Yet BCNR provides absolutely no justification for this assumption.

149.   In fact, the information contained in PE 15 (SECNAV Instruction 1650.1H) indicates that there is no material difference between "wound" and "injury" for purposes of entitlement to the Purple Heart Award, as a "wound" is expressly defined as "an *injury* to any part of the body from an outside force or agent . . . ."

150.   Even more important for Plaintiff's case is the following sentence, which provides that "[a] physical lesion is not required, provided the *concussion or other form of injury* received was a result of the action in which engaged."

151.   This definition would clearly explain why a doctor examining Plaintiff on September 18, 1944, seeing no open "wounds" on his body, would have deemed it more accurate to label Plaintiff's concussion as an "injury."

152.   In no way does this alteration support the conclusion drawn by the BCNR that Plaintiff's injury does not entitle him to receive the Purple Heart Award.

153.   Further evidence of the arbitrariness of the BCNR's decision can be gleaned from a comparison between the treatment of Plaintiff's case and that of Mr. LeClerc. (PE 11)

154.   The HQMC and BCNR treatment of the LeClerc case is the direct opposite of the instant case.

155.   LeClerc had not a single supporting document, and only one fellow Marine could say that he and LeClerc were "blown out of a fox hole."

156.    Page 8-7 of SECNAV Instruction 1650.1H (PE 15), however, requires that since LeClerc did not have medical entry proof, unlike Plaintiff, he needed *two* sworn eyewitness accounts to the combat concussion to qualify for the Purple Heart Award.

157.    LeClerc only had one eye witness, but the USMC chose to accept his and the one eyewitness's statements—with no supporting records—as adequate proof, while rejecting Plaintiff's statement, medical proof, and a contemporary news article stating that he was wounded.

158.    The material difference between the LeClerc case and Plaintiff's appears simply to be that a retired general was making LeClerc's case for him, while Plaintiff had to make his own case.

159.    Plaintiff fully supports Mr. LeClerc, but this disparity of treatment, where BCNR and HQMC waived probative requirements for LeClerc, but dismissed Plaintiff's much stronger and procedurally sufficient evidence, is a *per se* example of an arbitrary and capricious decision.

### The BCNR's opinion was contrary to law.

160.    In their 2008 letters, BCNR and HQMC affirmed S.M. Michael's letter 1650 MMMA-3 of 30 May 03 (PE 9) related to Plaintiff's original petition.

161.    That letter states: "The information [Plaintiff] submitted from his medical record can not be used as a determining factor in a Purple Heart award."

162.    There is no such standard, as medical records are a reliable means to document wounding from enemy action.

163.    First, PE 15, page 2-28, requires that a person claiming a Purple Heart "must have required treatment by a medical officer at the time of the alleged injury."

164.    It is abundantly clear that medical records must be the primary basis for awarding the Purple Heart.

165.    A key factor determining eligibility (for those who were not killed in action) is that they underwent medical treatment, which substantiates their eligibility for the Purple Heart.

166.    This is why, for instance, the first document related to Plaintiff's wound was from a medical evacuation point and specifically stated he was "wounded in action" and that he was provided "first aid in the field."

167.    Second, to out-of-hand reject any category of reliable evidence is clearly arbitrary and capricious—especially where the vagaries of war and the passage of time greatly affect the availability of records and make a circumstantial case that much more pertinent.

168.    To the extent the statement concerning the probative value of medical records is meant to convey that Plaintiff's records are not determinative here because they fail to demonstrate that the explosion causing Plaintiff's injury "was caused from enemy action," it is incorrect.

169.   Plaintiff's discharge record (PE 8) clearly states that Plaintiff "participated in action *against the enemy* at Peleliu Island."

170.   Furthermore, any presumption that Plaintiff needs to prove the explosion was caused by enemy fire on the vicious Peleliu battle field is also contrary to law.

171.   Title 10 U.S.C. § 1129 expressly authorizes the Purple Heart Award for wounds received in combat as a result of friendly fire after December 7, 1941.

172.   So long as Plaintiff's wounds did not result from his own willful misconduct or negligence, which they clearly did not (PE 3, 4), they provide the basis for the issuance of the Purple Heart Award.

### PRAYER FOR RELIEF

173.   Plaintiff respectfully requests that this Court find that the decision of the Board for Correction of Naval Records was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, order that Plaintiff be awarded the Purple Heart Medal, and grant such other relief as is allowed by law.

DATED: June 19, 2009          Respectfully submitted,

ADVOCATES FOR FAITH & FREEDOM
AMERICAN CENTER FOR LAW & JUSTICE


By: *Jennifer L. Monk*
      Jennifer L. Monk
      Robert H. Tyler
      Erik M. Zimmerman
      Carly F. Gammill
      *Attorneys for Plaintiff*

- 30 -

# CERTIFICATE OF SERVICE

I certify that I have served the attached AMENDED COMPLAINT, along with a copy of the original COMPLAINT filed in this matter and a copy of the SUMMONSES on the Defendants in the following manner:

By depositing the documents certified, postage paid, in the U. S. Mail on June _24_, 2009 to the following:

B.J. Penn, Secretary of the Navy
2000 Navy Pentagon
Washington, D.C. 20350-2000

H.C. Barnum, Jr.
Acting Assistant Secretary of the Navy
Manpower & Reserve Affairs
1000 Navy Pentagon
Washington, D.C. 20350-1000

Board for Correction of Naval Records
2 Navy Annex, Room 2432
Washington, D.C. 20370-5100

Eric Holder
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Thomas P. O'Brien
U.S. Attorney, Central District of California
Attn: Civil Process Clerk
300 N. Los Angeles Street
Suite 7616
Los Angeles, CA 90012

Jennifer L. Monk