# STATEMENT OF VICTOR J. ROGERS

My name is Victor Rogers. I have previously petitioned the Board for Correction of Naval Records (BCNR) for award of a Bronze Star and a Purple Heart, providing what supporting evidence I could from surviving records and my hand-written statement.

The BCNR explained that, for obvious reasons, I needed supporting eye witness accounts to complete my missing records. I sought the Bronze Star because I had been promised it by my acting company commander during the Battle for Okinawa. However he, and most of our company leadership, was killed and I can not say what ever happened to my buddies who may have witnessed events so long ago. So I understand I can not produce the necessary records to support my request to be considered for a Bronze Star. However, I am resubmitting my request for a Purple Heart for a severe concussion received four days into the Battle for Peleliu.

I again want the BCNR to see that my surviving medical records support my claim for a Purple Heart. My helper says that the BCNR's previous rejection seemed to zero in on the contradictory documents, while not crediting the balance of evidence in favor of my request.

To restate the record, I enlisted in the Marine Corps on June 23, 1943 at Rochester, New York, and was trained as a basic infantryman. I was sent to the Pacific Theater on April 8, 1944, with a replacement battalion, arriving in New Caledonia, and eventually going to join the First Battalion, Seventh Marine Regiment, First Marine Division, performing training on Pavavu. I was assigned to A Company, First Platoon. The less said about that place, the better.

The 7th Marines trained non-stop around Pavavu, and eventually at Guadalcanal, for amphibious operations, training to invade some island, yet to be named.

Embarking aboard transports, we found out on September 14, 1944 -- the day before we landed -- that we were to attack what the world came to know as Peleliu. I fought four days on Peleliu before being knocked out of combat by a Japanese shell, and was evacuated to a hospital ship. I stayed under medical care for about two weeks and then was returned to duty.

I continued training with Company A, and in July 1945 we again boarded transports for an operation, which we later were told was to be the invasion of the last island before invading the mainland islands of Japan. This was Okinawa, and we were told the Japanese would resist like never before, since it was a Japanese territory.

The intelligence was right. As E.B. Sledge, who was with me on Peleliu and Okinawa, wrote in With the Old Breed, it was a long, wet, awful nightmare of nonstop fighting, often taking and retaking the same terrain multiple times. Rain, mud and constant death wore us down as the fighting continued. I will not describe my exploits in detail, but what our company did was like what Nimitz said of the fight for Iwo Jima: "Uncommon

EXHIBIT ( 1 )

valor was a common virtue." I was mentally and physically exhausted by the non-stop fighting, weather, and losing much of my company.

After fighting on the front lines for some time, I was assigned to be a runner for a while. At one point, as I was told to go out again, I could not find my messenger's packet, and so they sent my buddy out instead. Right after he took off, I saw him shot dead by a sniper. It was just too much after all the carnage, and it seemed like all was lost. I broke down with battle fatigue and was evacuated, and that was the end of my war. What happened as I was transferred back to the U.S. though was loss of original records, and so what really happened on Peleliu was bollixed up. I hope to set the record straight, with your help.

E. B. Sledge wrote the best infantryman's history of the Marine experience in the Pacific Theater. Though he was in a different regiment than I was, his descriptions of training, and the fighting in Peleliu and Okinawa, read like he was beside me every step of the way. He quotes Lieutenant General Roy Geiger as testifying that Peleliu was the toughest battle of the entire Pacific war. Future Commandant Clifton Cates said it was one of the most vicious and stubbornly contested battles of the war. To me it was certainly hellish, though maybe Okinawa was worse from my view, because it went on much longer (I fought there 47 days).

But as to Peleliu, we landed on September 15, 1944. I guess I was pretty lucky that I was not killed or maimed during the war, but at the time, having been in the first wave into Peleliu (and later Okinawa), I had a different view of my luck.

I wasn't sure how I would react to combat, but I didn't have much time to think about it. Leaving the troop transports in amtracs, the 7th Marines led the way to the landing beaches under terrible shell fire. The Navy's "softening up" of Japanese defenses didn't seem to do much good. The second we hit the beach our platoon jumped out of the amtrac, and good thing too, as it blew up right after that. It was a mess and the Japanese were not going to let us take any ground uncontested.

The Japanese shelling never seemed to slow, and it appeared the result was in doubt as hundreds of Marine dead piled up on the beaches. But we got organized and slowly moved inland. The island was not very big, so the tactics were pretty simple: the regiments formed a line, and attacked across the air field toward the ridges.

The Japanese were well dug in and had developed a "defense in depth", which to us infantry guys meant nothing was given away. They had engineered the island so every yard was covered with fire.

But the weather added greatly to our misery and exhaustion from the shelling and machine guns rounds. Records show that the temperatures got up to 115 degrees, and it was so humid. There was no cover, and little water because any effort to find water just increased your chance of getting mowed down.

EXHIBIT ( _1_ )

So it went for four days and three nights. As the battle went on, we were all equally aware of the enemy fire and being thirsty. Though I was pretty junior, because of casualties at one point I was told to lead a patrol out to recon the Japanese positions before we moved forward again. I gathered a squad of Marines around me as we awaited instructions for the patrol. Then a Japanese shell landed right in the middle of us, and I was knocked out of combat.

My buddies later told me that several in the group I was with were killed. They said I was out cold and bleeding from the nose, ears, and mouth. I was treated at the BAS and moved to the beach and laid there for who knows how long, drifting in and out of consciousness, until they could get the wounded back out to the ships. I do not remember much of that.

I remember later waking up in a hospital ship. There was a lot of running around and yelling. I recall some corpsman or doctor looking at me and, seeing no open wounds, moved on. Frankly, that is all I remember for a while.

I was out from September 18, 1944 to September 29, 1944 before being returned to my unit. Mostly I remember the awful headaches, difficulty concentrating, ringing ears, and a painful shoulder which hurts to this day. I must have landed on it when the shell threw me through the air. Anyway, the medical records from my evacuation were pretty sketchy, and from the confusion of that hospital ship, the only surviving ship document says I had "heat exhaustion", when I really had a bad concussion. I want to discuss the evidence below to prove that I was wounded by shell concussion and am due the Purple Heart.

1. The circumstances of the evacuation. For obvious reason records were after the fact and not too exact. In the middle of a blazing battle with new casualties flowing in all the time, what they today call "triage" was quick and dirty. A guy who was leaking blood from his orifices and minor cuts/wounds and was unconscious was unremarkable in that mess on the beach, and when I woke up on the ship, all they saw was some Marine who was woozy and complaining of thirst. Obviously there was confusion as one document said the diagnosis was "heat exhaustion" and another was "wounded in action."

2. Diagnoses of heat exhaustion. Frankly, this seems to me as probably technically correct, but only partly so. Every Marine fighting on Peleliu had heat exhaustion. Words really fail me in describing how hot and humid it was. That, aggravated by the constant effort to have enough water, left you always seriously dehydrated. Who knows how many wounded Marines died because their bodies were already suffering from "heat exhaustion." But I will tell you this, the fighting was intense and no one I knew was being evacuated simply because of heat exhaustion. Men who were not seriously wounded, and I guess from my reading, those who were so worn down by the heat that they could not fight, were sent to the beach and returned after a day or so.

Enclosure (1) is an article written by a war correspondent who was at Peleliu. He says it was a "horrible place" and echoes E.B. Sledge's statement that the temperatures got up to

EXHIBIT ( 1 )

a humid 115 degrees. He states that by the fourth day (when I went down) "there were as many casualties from heat prostration as from wounds." He goes on to say that "most of those evacuated [for heat prostration] were returned to duty after a day or two of rest and rehabilitation. I, on the other hand, was in the hospital for a long time. I challenge anyone to document a "heat exhaustion" case that took almost two weeks to treat. On the other hand, I will bet nearly every Marine evacuated was at least in part listed as suffering "heat exhaustion."

3. Initial determination of "wounded in action". As I stated, I was told I was blown up by a shell and left unconscious, bleeding from my orifices and maybe from some shrapnel. (Though crawling and diving around that sharp coral surface left a lot of cuts, and so when I was in recovery, it was not clear what the cuts were from.) I do not remember much about being evacuated. But Enclosure (2), made from records at the beach evacuation point after I left the BAS, correctly says "wounded in action." It also says "First aid treatment given in the field. No record of treatment available at this activity." Then it says "Heat exhaustion."

This seems to be an after-the-fact record of my passing through the beach after being blown up. You have a guy who was treated on the battle field and evacuated, who is bleeding a bit (a probably universal thing considering all the flying coral shards and fragments), not coherent and sometimes unconscious. So you just put what was at least a secondary diagnosis for probably everyone who was not on the obvious verge of death: "heat exhaustion." That way you can make sure they get fluid drips no matter what their situation.

But the statement of "heat exhaustion" seems contradictory. It is contradictory to say I was wounded, treated in the field, not treated at the evacuation point, but suddenly there is the diagnosis. How can you have "no record of treatment", but then have a diagnosis? Know this though, no one who was simply "feverish and nauseated" (see below) would have been be evacuated from Peleliu, much less tagged as "wounded." They needed fighters too much.

The bottom line is that I was, according to the record, wounded, treated in the field, and evacuated to the rear. If I had been a routine "heat exhaustion" I would not have been further evacuated to the Division HQ in the rear.

4. Diagnoses aboard ship. The typed record upon my evacuation to the U.S.S. Leedstown says "Wounded" but also "Heat Exhaustion #2535." Enclosure (3). Obviously the record some clerk typed up later on had an evacuation tag which said "WIA" and perhaps a note of the heat exhaustion. As I said above, I remember a little of being on the ship that first day, and was really thirsty. It says "received aboard feeling feverish and nauseated." That is certainly not my language. But I would ask a seasoned doctor to say how you can observe a Marine drifting in and out of consciousness and complaining of thirst and tell the difference between heat exhaustion and concussion?

EXHIBIT ( 1 )

4

There is another important point: Enclosure (4), typed by records from the Marines in my battalion, says "18Sep44 evacuated aboard USS Samaritan from Peleliu Island, Palau Islands; 28 Sep 44, Arrived and adm sk US Fleet Hosp #110." Please note that Lieutenant Commander Gennaria on the Leedstown crossed out the term "wounded" evidently copied from the evacuation tag, and took it upon himself to change it to "injured". As I point out below, his record also says I was returned to duty on 18 September, which is obviously untrue. That calls the accuracy of the Leedstown records into question altogether.

5. <u>Record of "concussion"</u>. One thing you can say about my medical records is that they are not **now** detailed. That can to be expected in a combat situation and its aftermath. But Enclosure (5), written by Lieutenant Commander Fraser on "6-29-45" after my 47 days of combat in Okinawa, proves there are missing records which support my saying I was wounded. LCDR Fraser's notes document his review of my medical records at the time. He states "Preceding entries in health record are evaluated at this hospital, then states "Suffered concussion reaction at Peleliu . . . ." So he is stating the medical records at the time specifically said I suffered concussion at Peleliu.

I am not exaggerating the affects of shell fire. I had a lot of near misses in both Peleliu and Okinawa; in fact everyone fighting on the front lines did. Enclosure (6), part of my post-Okinawa medical records says "About May 12, 1945, while fighting on the front lines he [Rogers] says shells were landing all around. Patient states that on several occasions heavy enemy shells have landed and exploded only a few feet from him." So that is the difference between Okinawa and Peleliu: On Peleliu I was not knocked down, but was blown up and evacuated, bloodied and periodically unconscious, as "wounded."

6. <u>Length of treatment</u>. Enclosure (4) from my battalion shows that after I was evacuated from Peleliu to the Leedstown on 18 September, I was transferred to the USS Samaritan, taken to the Russell Islands and treated until September 29, 1944 at a shore hospital, and then returned to my unit. So the evidence is I was on hospital ships and in a shore hospital for nearly two weeks. Sir, the concussion from the Japanese shell really rang my bell. Common sense and experience tell you that nobody is treated in a hospital so long for "heat exhaustion."

I know the detailed records are not there, but the ones LCDR Fraser saw said "Suffered concussion reaction" on Peleliu, and weeks of treatment bolster the case that there were considerable medical records of that treatment that were lost after LCDR Fraser saw them. (Once again, the diagnosis from the Leedstown in Enclosure (3) calls into question the quality of the Leedstown record, especially since it says I was "returned to duty" on September 18th 1944, which is completely untrue since I was under medical care eleven more days!)

7. <u>Newspaper article listing me as wounded in action</u>. Enclosure (7) is a copy of the original newspaper article my parents kept from the Rochester newspaper. It says "Five Rochester service men were wounded in action, according to casualty reports received

EXHIBIT ( 1 )

here today." It then says "Marine Pfc. Victor J. Rogers, 19 . . . was wounded in action in the Peleliu Islands in September." BCNR earlier stated that a newspaper article was not evidence. But in a court of law there is what they call "direct evidence" (in this case from the medical records) and there also is "circumstantial evidence." A person can be convicted based on circumstantial evidence. So please consider the circumstantial evidence here.

Consider that the newspaper got a "list" of WIA. Where from? Obviously the Navy Department put out WIA lists to local papers from official sources. Someone at Headquarters, U.S. Marine Corps obviously got official communication that I was WIA, and folks with "heat exhaustion", as your explanation says, have never been considered WIA.

By contrast, I want to point out that S.M. Michael's letter form Headquarters, U.S. Marine Corps of May 30, 2003, admits that I was affected by an explosion, but then quips: (1) "The information [from his] medical record can not be used as a determining factor in a Purple Heart award"; and (2) that I had not shown the explosion "was caused from enemy action." Now there you have a strange analysis. The evidence from Enclosure (2) an actual record form my battlefield unit, says WIA, but that does not apparently count.. Then I am told medical records do not count. How else do you document wounding from enemy action? And finally there is the ridiculous point that "Sure, we can grant there was an explosion, but in the fury of the Peleliu battle, who knows it was from enemy action?" That seems pretty biased to me.

On balance, I believe this proves my records should be amended to reflect that I earned the Purple Heart. I want the record for my descendants to be accurate and fair, and ask you help to right this incorrect record.

The above statements are true and correct to the best of my knowledge, information and belief, and involve matters upon which I am competent to testify.

_____
Signature

Subscribed in my presence, this 26th day of April, 2008

_____
Signature of Witness

EXHIBIT ( 1 )

6

# A Horrible Place

Among the few civilian news correspondents who chose to share the fate of the Marines on shore on Peleliu was Robert "Pepper" Martin, of *Time*, who furnished the following description of what it was like there:

Peleliu is a horrible place. The heat is stifling and rain falls intermittently—the muggy rain that brings no relief, only greater misery. The coral rocks soak up the heat during the day and it is only slightly cooler at night. Marines are in the finest possible physical condition, but they wilted on Peleliu. By the fourth day there were as many casualties from heat prostration as from wounds.

Peleliu is incomparably worse than Guam in its bloodiness, terror, climate and the incomprehensible tenacity of the Japs. By sheer brutality and fatigue, I think it surpasses anything yet seen in the Pacific, certainly from the standpoint of numbers of troops involved and the time taken to make the island secure.

On the second day, the temperature reached 105 degrees in the shade and there was very little shade in most places where the fighting was going on, and arguably no breeze at all anywhere. It lingered around that level of heat as the days dragged by (temperatures as high as 115 were recorded). Water supply presented a serious problem from the outset. This had been anticipated and in actual fact the solution proved less difficult than expected; the engineers soon discovered that productive wells could be drilled almost anywhere on the comparatively low ground, and personnel semi-permanently stationed near the beach found that even shallow holes dug in the sand would yield an only mildly repulsive liquid which could be purified for drinking with halizone tablets. But it continued necessary to supply the assault troops by means of scoured-out oil drums and five-gallon field cans. Unfortunately, steaming put the oil drums did not remove all the oil, with the result that many or most of the troops drinking water from the drums were sickened. When the captains of the ships in the transport area learned of this and of the shortage of water, they rushed cases of fruit and fruit drinks to the beaches to ease the problem somewhat.

The water situation presented a problem even in the case of troops operating on comparatively level and open ground. Once the fighting entered the ridges, terrain difficult merely to traverse without having to fight, the debility rate shot upward so alarmingly that an emergency call was sent to all the ships off-shore to requisition every available salt tablet for issue to the 1st Marines.

The statement that heat prostrations equalled wound casualties is apt to be misleading. Most of those evacuated were returned to duty after a day or two of rest and rehabilitation; hence, their absence from the frontlines did not permanently impair the combat efficiency of their units. But such numerous cases did strain the already overburdened Medical Corps elements.

*The antitank ditch dug by the Japanese along the center and right of Orange Beaches 1 and 2 soon after the landing became the locations of command posts of various units. Both the 5th Marines' and 3/5's CPs were located there, as was the 7th Marines', shown here. BGen Oliver P. Smith with the advance element of the division CP set up in the ditch also.*
Department of Defense Photo (USMC) 94939



MEDICAL HISTORY

ROGERS
Victor                John, Jr.

FIRST MARINE DIVISION, FMF.

A  9-18-44:
HEAT EXHAUSTION
                          # 2535
Not Misconduct.  KL.  "K"
1. Within command.
2. Work.
3. Negligence not apparent.
4. Wounded in action.

First aid treatment given in the
field. No record of treatment
available at this activity.

T 9-18-44:Transferred this date to
O the U.S.S. LEEDSTOWN (APA-56) for
further treatment and disposition.

Not seen by this activity.

J. H. MURPHY
LT. (MC) USNR.

EXHIBIT ( 3 )

## MEDICAL HISTORY

_____ ROGERS _____
(Surname)

__ VICTOR _____ J __
(Christian name(s))

Born: Place ___ N. Y. _____ Date _____

STATE NAME OF PLACE    DATE EACH NEW ENTRY

**U.S.S. LEEDSTOWN (APA-56)**

A. 9-18-44

DIAGNOSIS: Heat exhaustion #2535

K.l. "K"

Is not due to own misconduct.
Did not EPTE.
1. Within command.
2. Work.
3. Negligence not apparent
4. Patient was ~~wounded~~ while
engaged in the invasion and
occupation of Palau.
PAST HISTORY: Irrelevant.
FAMILY HISTORY: Irrelevant.
PHYSICAL EXAMINATION: Patient was
received aboard feeling feverish and
nauseated.

TREATMENT: Salt tablets and force
fluids, bed rest.

T. ____

Transferred this date to: _____

C. REED GENNARIA
Lieut. Comdr. (MC) USNR

EXHIBIT ( 4 )

ENCLOSURE ( 6 )

The man ally when June
evacuated on the hospital
ship to a fleet hospital from
the appearance and gangrene
original and the boy from
the mainland came from
1/44 to Sept 8/44 and
arrived on the USS hospital

28Sep44, evacuated aboard USS SAMARITAN from Peleliu Island, Palau
Island 8: 29Sep44. Arrived and admsk US Fleet hosp #110, Banika,
Russell Island Group, British Solomon Islands.

Robert L. Gibson

ROBERT L. GIBSON
USNCR Sn.
Personnel0

Commanding

OCT 26 1945  4MB, NOB, Nwpt, R.I.

U.S. Naval ____
COLONEL

MEDALS (including good-conduct medals and bars, but excluding those awarded for qualification with infantry weapons), BADGES, AND DECORATIONS; MEDAL OR BADGE NUMBER AND DATE AWARDED

LETTERS OF COMMENDATION (Pasted on page 23)

| | Date | By Whom Issued |
|---|---|---|
| | | |

EXHIBIT ( 5 )
1 OF 2

# MEDICAL HISTORY

| STATE NAME OF PLACE | DATE EACH NEW ENTRY |
|---|---|

BASE
MEDICAL FACILITIES

EVACUATION CENTER

9-29-44: Hospitalized at 46th USN
CB Dispensary from 9-25-44 to
9-29-44. Received this date for
evacuation.

A. S. PEDERSEN
Chief Pharmacist, USN

9-29-44: TO DUTY THIS DATE

FIRST MARINE DIVISION, FMF.

A 2-23-45:

CELLULITIS, SKIN, RT. KNEE #1305
NEPTE: Not misconduct.

CC: Pain, swelling, drainage from skin on
rt. knee.

PI: Has had frequent boils on the buttocks,
the last appearing two wks. ago. Week
ago noted swelling, pain, and redness of
knee. Began to discharge pus yesterday.
Has mild upper respiratory infection.

PE: Throat membrane injected. Chest sounds
course. Rt. knee has swollen area on
anterior surface with pus exuding.

RX: Hot MgSO4 soaks tid. Continuous wet
dressings. Sulfadiazine 15grs. q3h.
Saline nose irrigation bid. Soda Bicarb
15 grs. q3h.
Hospitalized in the field hospital.

D 2-27-45: Returned to duty this date.

K.W.OLSHAUSEN
LT(LC)USNR

EXHIBIT ( 5 )

2 OF 2

# MEDICAL HISTORY

ROGERS
(Surname)

Victor                    John
(Christian name(s))

Born: Place _____ Date _____

STATE NAME OF PLACE        DATE EACH NEW ENTRY

PT, U.S. NAVAL HOSPITAL, AIEA HEIGHTS, T. H.

DATE OF ADMISSION     6-28-45

DIAGNOSIS: FATIGUE COMBAT

2172

ORIGIN IS not DUE TO MISCONDUCT AND
DID NOT EXIST PRIOR TO HIS ENLISTMENT.

6-29-45: Preceding entries in health
record are evaluated at this hospital.
This patient was also observed at an
Army Hospital from 8-25-45 to 6-22-45.
Considerable improvement noted at that
hospital but was evacuated to this hos-
pital because he was considered unfit
for further combat duty at this time.
Patient has negative background of psy-
chiatric determinations. Suffered con-
cussion reaction at Pelelieu and further
psychic trauma at Okinawa. Admitting
diagnosis retained.
It is recommended that this patient be
evacuated to a USNH in the continental
United States for further treatment
and disposition.
                    JUL 8  1945

TRA VER  CLASS   16    for       hds.

H.E. FRASER,
Lt. Comdr. MC, USNR.

over.

EXHIBIT ( 6 )

**Watch Your P...**

CANNED GOODS—Book 4, blue stamp
W5, valid indefinitely, worth 10 point...
MEATS, FATS, OILS—Book 4 red stamp...
D91, good for 10 points indefinitel...
SUGAR—No. 30 through 35 stamps, Bo...
...ping stand good through...
...pounds canning sugar until Feb. 28.

# Casualty Reports List Five Wounded

Five Rochester service men were wounded in action, according to casualty reports received ...

### Pfc. Victor P. Rogers



Marines ... ...tor Rogers, 19, son of ... ...ctor Rogers, ... Salina, was wounded in action in the Palau ... Islands in September.

A former Bausch & Lomb employe, Pfc. Rogers entered service in October, 1943, and has been overseas since April. A letter to his parents said he had recovered but was still "taking it easy."

Wounded

### Pvt. George M. Kolb Jr.

Pvt. George M. Kolb Jr. ...



# United States Marine Corps

## Certificate of
## Honorable and Satisfactory Service
### in World War II

*This is to Certify that*

VICTOR J. ROGERS, JR.

*has satisfactorily completed active service and is this date*

DISCHARGED

*Entered the United States Marine Corps*

9 September, 1943

*Began Active Service*

9 September, 1943

*Upon relief from Active Duty held Rank of*

Private First Class

*given at* MB, NOB, Newport, R.I.

_____
Signature

*dated* 26 October, 1945

Colonel, USMC
Rank

EXHIBIT ( 8 )

Enlisted at: Buffalo, N.Y. on the 9th day of September, 1943 to serve Natl. Emerg. years

Born 19 September, 1925 (Date) at Rochester, N.Y.

When enlisted was 65 inches high, with hazel eyes, brown hair, complexion: ruddy citizenship: U.S.

Previous service: None

Rank and type of warrant at time of discharge: Private First Class (TW)

Weapons qualification (Rifle Marksman) December 7, 1943; Qualified Bayonet.

Special military qualifications: None

Service (sea and foreign): Asiatic-Pacific Area April 8, 1944 to July 14, 1945.

FOR CONVENIENCE, A CERTIFICATE OF ELIGIBILITY NO. 6837 HAS BEEN ISSUED BY THE VETERANS ADMINISTRATION TO BE USED FOR THE FUTURE REQUEST OF ANY GUARANTY OR INSURANCE BENEFIT UNDER TITLE III OF THE SERVICEMEN'S READJUSTMENT ACT OF 1944, AS AMENDED, THAT MAY BE AVAILABLE TO THE PERSON TO WHOM THIS SEPARATION PAPER WAS ISSUED.

Wounds received in service: None

Battles, engagements, skirmishes, expeditions: Participated in action against the enemy at Peleliu Island September 15, 1944 to September 18, 1944; Okinawa, Ryukyu Islands April 1, 1945 to May 18, 1945.

Remarks: Awarded Honorable Service Lapel Button; Auth for Discharge: Hq. MarCorps Ltr. 1500-120 over DGK-112-dmah, dated 12Sep45; 15 days lost Art 10-99 (1) MCM

Character of service excellent.

Serial number 545906

Colonel , U.S.M.C.

Is physically qualified for discharge. Requires neither treatment nor hospitalization.

I certify that this is the actual print of the right index finger of the man herein mentioned.

Lieut , U.S. NR
and Medical Officer.

Monthly rate of pay when discharged Fifty Four Dollars

I hereby certify that the within named man has been furnished travel allowance at the rate of $.05 cents per mile from Newport, R.I. to Buffalo, N.Y.

and paid $52.27 in full to date of discharge.

Paid $100 mustering out payment (Z)

(Signature of man.)

Colonel , U.S.M.C.
Commanding Officer.

EXHIBIT (8)



**DEPARTMENT OF THE NAVY**
HEADQUARTERS UNITED STATES MARINE CORPS
3280 RUSSELL ROAD
QUANTICO, VIRGINIA 22134-5103

IN REPLY REFER TO:
1650
MMMA-3
30 May 03

MEMORANDUM FOR THE EXECUTIVE DIRECTOR, BOARD FOR CORRECTION OF
NAVAL RECORDS

Subj:   REQUEST FOR ADVISORY OPINION(S) IN THE CASE OF
        MR. VICTOR J. ROGERS, JR., FORMER MARINE

Encl:   (1) Copy of CMC ltr 1650 MMMA-3 of 5 Oct 01
        (2) Copy of CMC ltr 1650 MMMA-3 of 11 Mar 03

1.  A review of the records reveal that we have responded to
Mr. Rogers on October 5, 2001 and March 11, 2003 regarding his
entitlement to a Purple Heart Medal.  The records also reveal
that BCNR also denied the Purple Heart Medal to him on
September 3, 2002.  Copies of previous correspondence are
forwarded as enclosures (1) and (2).

2.  As previously stated in our letters, a review of the records
failed to reveal that he was ever wounded in action by the
enemy.  The information he submitted from his medical record can
not be used as a determining factor in a Purple Heart award.
It does not show that the explosion was caused by enemy action.
Since he has not provided any additional information that was
not previously reviewed, it has been determined that that he is
not entitled to a Purple Heart award.  If he would provided the
required eyewitness statements, we will be glad to again review
his request.

3.  Point of contact at MMMA is Mrs. D. McKinnon at 784-9340.

                              S. M. MICHAEL
                              By direction

EXHIBIT ( 9 )



**DEPARTMENT OF THE NAVY**
BOARD FOR CORRECTION OF NAVAL RECORDS
2 NAVY ANNEX
WASHINGTON DC 20370-5100

WDP:crs:wma
Docket No.1001-02
2620-03/9994-06
June 9, 2008

MR VICTOR J ROGERS
14016 GOPHER CANYON ROAD
VICTORVILLE CA  92394

Dear Mr. Rogers:

This is in reference to your application, DD Form 149, dated
April 25, 2008.  You previously petitioned the Board and were
advised in our letters of September 3, 2002, July 30, 2003
and June 19, 2007, that your applications have been denied.

Your current application has been carefully examined.
Although, at least some of the evidence you have submitted
is new, it is not material.  In other words, even if this
information was presented to the Board, the decision would
inevitably be the same.  Accordingly, reconsideration is not
appropriate at this time.

It is regretted that the facts and circumstances of your
case are such that a more favorable reply cannot be made.

Sincerely,

W. DEAN PFEIFFER
Executive Director

EXHIBIT ( 10 )

The Shelbyville News **Always faithful**
Thursday, July 31, 2008
*Veteran awarded Purple Heart after 63 years* By Lisa Jacques
Arthur "Earl" LeClerc, 84, has received the Military Order of the Purple Heart award for injuries
the corporal sustained in World War II more than 60 years ago during the Battle of Okinawa.
More than 50 guests attended an award ceremony Tuesday that took place at the Veterans of
Foreign Wars Post No. 2695. Capt. Donald Barnes and 1st Sgt. William Hess, both stationed at
the Heslar Naval Armory in Indianapolis, presented the Purple Heart, which is exclusively
awarded to members of the military wounded or killed in battle. "It's a wonderful honor for all of us
to present this award," said Barnes. "We truly appreciate his service." Barnes described Okinawa
as "one of the bloodiest, if not the bloodiest, battles" and thanked LeClerc, citing the Marine
Corps motto, "semper fidelis" or "always faithful," to explain that even after several decades, the
military faithfully honor its veterans. Members of the American Legion Post No. 70 and VFW Post
No. 269 honor guards were present to salute the occasion with guns, and guests were provided a
spaghetti lunch by the Ladies Auxiliary. LeClerc's wife, Jeane, and four brothers, Rex, Larry,
Raymond and Bud, were present for the ceremony. The Purple Heart first was established in
1782 as the Badge of Military Merit by then-Gen. George Washington. LeClerc, a Shelbyville
resident born in Aurora, is a 1942 graduate of Waldron Junior-Senior High School and a retired
Indianapolis-based union electrician. He was wounded May 22, 1945, on Okinawa, where he and
a fellow soldier and friend, Harry Lowe, who also survived, were thrown from a foxhole by the
force of an artillery shell. "I got shot out of the foxhole with artillery," he said. "That means you
can't do anything. You're out." LeClerc was left unconscious from a concussion blast, which
causes a victim to bleed from the ears, nose and mouth without leaving a scratch on the body. "I
ended up in two or three hospitals," he said. LeClerc was sent back to the United States, and he
was discharged from military service on Oct. 30, 1945. The war in the Pacific Theater had ended
in September with the surrender of Japan. He had participated in combat operations on the
Pacific islands of Bougainville, Guam and Okinawa. During LeClerc's Purple Heart ceremony,
Barnes drew attention to the veteran's service in one of the Marine Corps raider battalions, "which
is a really big deal." In 1942, four Marine Raider battalions were formed, and the men who
comprised it became known as lethal jungle fighters. They carried out clandestine
reconnaissance operations and were activated to provide fast, hit- and-run assaults. By the time
of the Battle of Okinawa, LeClerc's battalion had been redesignated as the 4th Marine Regiment.
"They were equal to the first special operations unit the Marine Corps ever had," Barnes said. "It's
pretty historic." LeClerc originally enlisted in the Marines in 1943 as a rifleman, later becoming an
automatic rifleman selected for the Marine Raiders. "I think they were looking for a lot of guys
without a lot of ties," Barnes said. "It was dangerous." The delay in receiving the Purple Heart
award was partly because of disorganization on the part of the military at the time - many wounds
were not recorded, and hospital records were incomplete - and partly because LeClerc said he
was in no rush to receive it. "It was my fault I didn't receive it sooner," he said. LeClerc had been
given paperwork to complete that would have gotten him the Purple Heart earlier, but he never
got around to filling it out. Kuhn wrote a letter to Marine Commandant Gen. James T. Conway,
the highest ranking officer in the U.S. Marine Corps, at the Pentagon, and he issued the order to
grant LeClerc the Purple Heart. Relatives in recent years had some difficulty obtaining the Purple
Heart for LeClerc since an official record of his wounds did not exist. LeClerc's youngest brother,
Larry, contacted a distant family relative, retired Brig. Gen. Dan Kuhn, who was once a
commanding general of the First Provincial Marine Brigade. "He got this done," LeClerc said.

EXHIBIT ( 11 )



# DEPARTMENT OF THE NAVY
HEADQUARTERS UNITED STATES MARINE CORPS
3280 RUSSELL ROAD
QUANTICO, VIRGINIA 22134-5103

IN REPLY REFER TO:
1650
MMMA-3
18 Dec 08

Mr. Victor J. Rogers
14016 Gopher Canyon Road
Victorville, CA 92394

Dear Mr. Rogers:

This responds to your inquiry, concerning a Purple Heart Medal for your service in the U.S. Marine Corps.

A review of your records revealed that this Headquarters previously denied your request for a Purple Heart Medal on October 5, 2001, March 11, 2003, and October 26, 2004. The Board for Correction of Naval Records (BCNR) denied your request for a Purple Heart Medal on September 3, 2002 and July 20, 2003.

Since BCNR acts on behalf of the Secretary of the Navy, the Commandant of the Marine Corps cannot disturb or overturn the findings of that agency. Therefore, any further inquiries into this matter must be made directly to BCNR. They can be contacted by writing to the following address:

Board for Correction of Naval Records
#2 Navy Annex
Washington, DC 20380-1775

A copy of this letter will be filed in your official military records, which have been returned to the National Personnel Records Center. Any further inquiries should be directed to Navy Personnel Command, Retired Records Section, PERS 312D2, Room 5409, 9700 Page Avenue, St. Louis, Missouri, 63132.

Sincerely,

E. M. HENSEN
Assistant Head, Military Awards Branch
Personnel Management Division
By direction of the
Commandant of the Marine Corps

EXHIBIT ( 12 )

MayoClinic.com tool

Home    Log in    Register now    RSS

Apr 23, 2008

# Heat exhaustion: First aid

Heat exhaustion is one of the heat-related syndromes, which ranges in severity from mild heat cramps to heat exhaustion to potentially life-threatening heatstroke.

Signs and symptoms of heat exhaustion often begin suddenly, sometimes after excessive exercise, heavy perspiration and inadequate fluid intake. Signs and symptoms resemble those of shock and may include:

- Feeling faint or dizzy
- Nausea
- Heavy sweating
- Rapid, weak heartbeat
- Low blood pressure
- Cool, moist, pale skin
- Low-grade fever
- Heat cramps
- Headache
- Fatigue
- Dark-colored urine

If you suspect heat exhaustion:

- Get the person out of the sun and into a shady or air-conditioned location.
- Lay the person down and elevate the legs and feet slightly.
- Loosen or remove the person's clothing.
- Have the person drink cool water.
- Cool the person by spraying or sponging him or her with cool water and fanning.
- Monitor the person carefully. Heat exhaustion can quickly become heatstroke.

If fever greater than 102 F (38.9 C), fainting, confusion or seizures occur, dial 911 or call for emergency medical assistance.

ARTICLE TOOLS

Enter e-mail address

E-mail this
Larger type
Reprints and permissions

MAYO CLINIC
InTouch

Symptom
Checker

First Aid Tips

ER Finder
& more!

All on your
Mobile Phone!



EXHIBIT ( 13 )

1 of 1

GO

Home   Login   Register now   RSS

Apr 23, 2009

# Concussion

CONTENTS OF CONC

- Introduction
  Signs and symptoms
- Causes
- Risk factors
- When to seek medical advice

- Screening and diagnosis
- Complications
- Treatment
- Prevention

Enter e-mail address

## Signs and symptoms

The signs and symptoms of a concussion can be subtle and may n immediately. Symptoms can last for days, weeks or longer.

The two most common concussion symptoms are confusion and a The amnesia, which may or may not be preceded by a loss of consciousness, almost always involves the loss of memory of the i caused the concussion.

Other immediate signs and symptoms of a concussion may includ

- Headache
- Dizziness
- Ringing in the ears
- Nausea or vomiting
- Slurred speech

Some symptoms of concussions don't appear until hours or days l include:

- Mood and cognitive disturbances
- Sensitivity to light and noise
- Sleep disturbances

MAYO CLINIC WELLNESS SOLUTIONS FOR

- Integrative medicine
- Gentle yoga
- Daily nutrition guide

Check out these best-sellers
and special offers on books
and newsletters from Mayo
Clinic

Head trauma is very common in young children. But concussions can be
difficult to recognize in infants and toddlers because they can't readily
communicate how they feel. Nonverbal clues of a concussion may include:

- Listlessness, tiring easily
- Irritability, crankiness
- Change in eating or sleeping patterns
- Lack of interest in favorite toys
- Loss of balance, unsteady walking

PREVIOUS

NEXT

EXHIBIT ( 14 )
1 OF 3

Find Information on Brain Injury Diagnosis at Disaboom

Home    About Us    News & Events    Contact Us    Directions    |Search

University of Missouri
# HEALTH CARE

Health Information    Services    Physicians    Referring Physicians    Hospitals and Clinics    Academic Affiliates    Patients & Visitor

**Neuromedicine**

Neurological Surgery

**Chiari I Malformation**

About Chiari Malformation
Anatomy of the Brain
Diagnosis
Neurological Exam
Questions to Ask
Recovery
Symptoms
Treatment

## Concussion

The brain is composed of soft, delicate structures that lie within the rigid skull. Surrounding tough, leathery outer covering called the dura (door-a). Within the brain are (cranial) nerve responsible for many activities, such as eye opening, facial movements, speech and hearir carry and receive messages that allow the person to think and function normally. There are that control level of consciousness and vital activities, such as breathing. The brain is cushi and spinal fluid. There is very little extra room within the skull cavity.

An injury to the head causes the brain to bounce against the rigid bone of the skull. This for tearing or twisting of the structures and blood vessels of the brain, which results in a breakr normal flow of messages within the brain. The damage to the brain generally is found deep tissue. Because of this damage, the normal function of the brain signals are interrupted.

### Concussion categories

**Grade 1**
The mild concussion occurs when the person does not lose consciousness (pass out) but r dazed.

**Grade 2**
The slightly more severe form occurs when the person does not lose consciousness but ha confusion and does not recall the event.

**Grade 3**
The classic concussion, which is the most severe form, occurs when the person loses cons brief period of time and has no memory of the event. Evaluation from a health-care provide performed as soon as possible after the injury.

A concussion can happen to anyone, at any time. The most common causes of concussior to the head from a motor vehicle crash, fall or assault. People at higher risk are those who walking and fall often, those who are active in high impact contact sports and those who an thinners, such as coumadin. Mild head injury, such as concussion is a frequent cause for h admission, with an estimate of more than 600,000 cases per year in the United States.

### Signs and symptoms

The signs and symptoms of a concussion include severe headache, dizziness, vomiting, in one pupil or sudden weakness in an arm or leg. The person may seem restless, agitated ( Often, the person may have memory loss or seem forgetful. These symptoms may last for : weeks, depending on the seriousness of the injury. Any period of loss of consciousness or head injury should be evaluated by a health-care professional. As the brain tissue swells, tl feel increasingly drowsy or confused. If the person is difficult to awaken or passes out, mec should be sought immediately. This could be a sign of a more severe injury.

### Diagnostic tests

If your health-care provider suspects a concussion, the following tests may be ordered.

EXHIBIT ( 14 )    2 of 3

- **CT scan**

  This is a special X-ray image of the brain. The test is performed by having the patien
  ray table that slides into a round, open scanner. The X-ray images are taken as the ρ
  on the X-ray table. Often, this test involves the injection of a contrast dye to obtain be
  brain structures (be sure to tell the technician if the person is allergic to contrast dye)

- **MRI (magnetic resonance imaging)**

  This is a special non-X-ray image of the brain to examine the structures. No X-rays a
  test. The test is performed by having the patient lie still while in the scanner, as the p
  sensitive to any movement. There is a machine-like sound while the pictures are bein
  space inside the tube is quite snug; therefore be sure to notify the technician if the pe
  claustrophobia or is uncomfortable in tight places. Because this test is performed witl
  power magnet, it may not be performed on anyone with a metal implant (i.e. artificial
  joints, aneurysm clips, shrapnel or metal heart valves).

## Treatment

The treatment for a concussion is usually to watch the person closely for any change in lev
consciousness. The person may need to stay in the hospital for close observation. Surgery
necessary. Headache and dizziness are common, but if the headache persists or becomes
best to seek medical attention.

Post-concussion syndrome may occur in some people. The syndrome generally consists o
headache, dizziness, irritability, memory changes and vision changes. The person may see
emotional or unable to control their emotions. Some people experience unexplained depre:
with concentration or problems with thinking and planning ahead also are reported. Sympto
weeks or even months after the initial injury. Although the symptoms generally resolve ove
people need a rehabilitation specialist to oversee a program for recovery.

It is important to keep in mind that recovery from a traumatic brain injury can be very slow.
several days can go by without seeing any major visible change. This is not unusual, and it
the health-care providers if any changes have occurred. It is also important to try to get enc
nutrition while waiting for the patient to recover. It is normal to feel frustrated, overwhelmed
worried. Sometimes a friend, or support group can help. Before your stress gets out of cont
someone who can help.

An excellent source for further information or support is

Brain Injury Association
1776 Massachusetts Ave.
NW Suite 100 Washington, DC, 20036
(202) 296-6443
(800) 444-6443

EXHIBIT ( 14 )

3 OF 3



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

SECNAVINST 1650.1H
NDBDM
AUG 2 2 2009

SECNAV INSTRUCTION 1650.1H

From:  Assistant Secretary of the Navy (Manpower and Reserve Affairs)

Subj:  NAVY AND MARINE CORPS AWARDS MANUAL

1.  <u>Purpose</u>.  To provide guidance and regulations concerning awards available for recognizing individuals and units in the Naval Service.

2.  <u>Cancellation</u>.  SECNAVINST 1650.1G.

3.  <u>Award Websites</u>

   a.  Navy:  <u>https://awards.navy.mil</u>.

   b.  Marine Corps:  <u>http://awards.manpower.usmc.mil</u>.

4.  <u>Summary of Changes</u>.  This instruction has been updated and administratively revised and should be reviewed in its entirety. The following specific changes have been incorporated:

   a.  Establishment of the Afghanistan Campaign Medal, Iraq Campaign Medal, Global War on Terrorism Expeditionary Medal, Global War on Terrorism Service Medal, Korea Defense Service Medal, and Ceremonial Guard Ribbon.

   b.  Addition of a Prior Service and Veteran Awards Chapter.

   c.  Revision of the Combat Action Ribbon eligibility criteria to include Improvised Explosive Devices (IEDs).

   d.  Change in award concurrence requirements for Naval personnel temporarily assigned to other U.S. Armed Services.

   e.  Establishment of gold 5/16-inch Arabic numerals as the attachment to denote award(s) of an Individual Air Medal.

   f.  Revision of Navy and Marine Corps Overseas Service Ribbon eligibility criteria for Reserve personnel.

EXHIBIT ( 15 )

g.  Notice of the Fleet Marine Force (FMF) Officer and Enlisted Warfare Qualification Badges as superseding the FMF Ribbon.

h.  Separation of Foreign Awards and Foreign Gifts into two chapters.

i.  Clarification of premature disclosure policy.

j.  Revisions to Delegated Awarding Authority.

k.  Revision of policy regarding the wear of foreign military decorations and U.S. non-military decorations.

l.  Delineation of specific instructions regarding processing awards for entry into the Navy Department Awards Web Service (NDAWS).

m.  Inclusion of updated listings of operations approved for various campaign and service medals.

n.  Administrative changes in citation formatting, including clarification of required and optional language, and the addition of an acknowledgement of years of service in awards for retiring personnel.

5.  Forms and Reports

a.  OPNAV 1650/3 Personal Award Recommendation and OPNAV 1650/14 Unit Award Recommendation may be downloaded from the Navy Awards website at https://awards.navy.mil.

b.  The reporting requirements contained in Chapter 9 are assigned symbol 0216-DOS-AN(1650) and are approved per SECNAV M-5214.1.

William A. Navas, Jr.
**Assistant Secretary of the Navy**
**(Manpower and Reserve Affairs)**

Distribution:
Electronic only, via Navy Directives Website
http://neds.daps.dla.mil

EXHIBIT ( 15 )

221.  Processing of Recommendations......................  2-16

        1.  Submission...................................  2-16
        2.  Premature Disclosure.........................  2-17

222.  Responsibilities of Awarding Authorities...........  2-17

        1.  Initial Review of Awards.....................  2-17
        2.  Award Elements...............................  2-17
        3.  Actions After Award Presentation.............  2-18
        4.  Administrative Requirements..................  2-18

223.  Transmittal of Awards..............................  2-19
224.  Presentation of Decorations........................  2-20

Section 3.  REQUIREMENTS .................................  2-21

230.  Specific Military Decorations......................  2-21

        1.  Medal of Honor...............................  2-21
        2.  Navy Cross...................................  2-22
        3.  Distinguished Service Medal..................  2-23
        4.  Silver Star Medal............................  2-23
        5.  Legion of Merit..............................  2-24
        6.  Distinguished Flying Cross...................  2-24
        7.  Navy and Marine Corps Medal..................  2-25
        8.  Bronze Star Medal............................  2-26
        9.  Purple Heart Medal...........................  2-27
       10.  Meritorious Service Medal....................  2-28
       11.  Air Medal....................................  2-28
       12.  Navy and Marine Corps Commendation Medal.....  2-31
       13.  Navy and Marine Corps Achievement Medal......  2-32
       14.  Combat Action Ribbon.........................  2-33

Appendix A to Chapter 2 – USN Electronic Award Submission
                          Procedures/OPNAV Form 1650/3.....  2-35
Appendix B to Chapter 2 - Sample Citations..................  2-39
Appendix C to Chapter 2 - Procurement Information...........  2-54
Appendix D to Chapter 2 – Air Medal (Strike/Flight)
                          Eligibility Periods..............  2-57
Appendix E to Chapter 2 - Combat Action Ribbon Eligibility
                          Periods........................  2-58

EXHIBIT ( 15 )

specific act within that period, if warranted.

c. Combat Distinguishing Device. The Combat Distinguishing Device may be authorized for this award.

9. Purple Heart Medal

a. Authorization. E.O. 9277 of 3 December 1942, E.O. 10409 of 12 November 1952, E.O. 11016 of 25 April 1962 as amended by E.O. 12464 of 23 February 1984, 10 U.S.C. §1129, and Public Laws 98-525, 104-106, and 105-851.

b. Eligibility Requirements. Awarded to members of the Armed Forces of the United States who, while serving under competent authority in any capacity with an Armed Force of the United States after 5 April 1917, have been killed or wounded.

(1) In action against an enemy of the United States.

(2) In action with an opposing armed force of a foreign country, in which the Armed Forces of the United States are or have been engaged.

(3) While serving with friendly foreign forces engaged in an armed conflict against an opposing armed force, in which the United States is not a belligerent party.

(4) As the result of an act of any such enemy or opposing armed force.

(5) As the result of an act of any hostile foreign force.

(6) As the result of friendly weapons fire while actively engaging the enemy.

(7) As the indirect result of enemy action (e.g., injuries resulting from parachuting from a plane brought down by enemy or hostile fire.)

(8) As the result of maltreatment inflicted by their captors while a prisoner of war.

(9) After 28 March 1973, as a result of international terrorist attack against the U.S. or a foreign nation friendly to the U.S.

EXHIBIT ( 15 )

(10) After 28 March 1973, as a result of military operations while serving outside the territory of the United States, as part of a peacekeeping force.

c. An individual must have been wounded either as a direct or indirect result of enemy action. A "wound" is defined as an injury to any part of the body from an outside force or agent, sustained while in action as described in the eligibility requirements. A physical lesion is not required, provided the concussion or other form of injury received was a result of the action in which engaged.

d. Except in the case of a prisoner of war, the wound for which the award is made must have required treatment by a medical officer at the time of injury. Only one award is authorized for more than one wound or injury received at the same instant, from the same missile, force, explosion, or agent. Prisoners of war, if entitled, will be limited to a single Purple Heart covering the entire period of their captivity.

e. Chapter 8 contains information regarding eligibility determinations for prior service personnel.

10. Meritorious Service Medal

a. Authorization. E.O. 11448 of 16 January 1969, as amended by E.O. 12312 of 2 July 1981.

b. Eligibility Requirements. Awarded to members of the Armed Forces of the United States, or members of the armed forces of a friendly foreign nation, who distinguish themselves by outstanding meritorious achievement or service to the United States. To justify this decoration, the acts or services rendered by an individual, regardless of grade or rate, must have be comparable to that required for the Legion of Merit, but in a duty of lesser responsibility. The Meritorious Service Medal is the counterpart of the Bronze Star Medal for the recognition of meritorious non-combat service. When the degree of meritorious achievement or service rendered is not sufficient to warrant the award of the Meritorious Service Medal, the Navy Commendation Medal, when appropriate, should be considered.

11. Air Medal

a. Authorization. E.O. 9158 of 11 May 1942, as amended by E.O. 9242-A of 11 September 1942.

EXHIBIT ( 15 )

Section 2.   FOREIGN DECORATIONS ...........................   7-1

720.  Foreign Personal Awards.............................   7-1
721.  Foreign Unit Awards.................................   7-2

        1.  Philippine Republic Presidential Unit
            Citation...................................   7-3
        2.  Republic of Korea Presidential Unit Citation..   7-4
        3.  Vietnam Presidential Unit Citation...........   7-5
        4.  Republic of Vietnam Meritorious Unit Citation.   7-5

722.  Multilateral Service Awards.........................   7-5

        1.  United Nations Service Medal................   7-6
        2.  United Nations Medal........................   7-6
        3.  NATO Medal..................................   7-7
        4.  Multinational Force and Observers Medal.......   7-8
        5.  Inter-American Defense Board Medal...........   7-9

723.  Foreign Service Awards.............................   7-9

        1.  Republic of Vietnam Campaign Medal...........   7-9
        2.  Kuwait Liberation Medal (Saudi Arabia)........   7-10
        3.  Kuwait Liberation Medal (Kuwait).............   7-11
        4.  Republic of Korea War Service Medal..........   7-13


                Chapter 8 - Prior Service and Veteran Awards


Section 1.   GENERAL.......................................   8-1

810.  Purpose.............................................   8-1
811.  Reserve Personnel...................................   8-1
812.  Policy Considerations...............................   8-1

Section 2.   ADMINISTRATIVE PROCEDURES ....................   8-2

820.  Award Inquiries.....................................   8-2
821.  Replacement Medals..................................   8-4
822.  Eligibility of Merchant Marine Personnel............   8-4
823.  Submission of Requests Under 10 U.S.C. §1130 .......   8-5
824.  Information Resources ..............................   8-5

Section 3.   AWARD REQUIREMENTS ............................    8-6

   830.   General...........................................    8-6
   831.   Specific Award Information ........................    8-6

            1.   Purple Heart Medal...........................    8-6
            2.   Distinguished Flying Cross and Air Medal
                 Based on Strike/Flight Criteria..............    8-7
            3.   Combat Action Ribbon.........................    8-11
            4.   Navy Fleet Marine Force Ribbon...............    8-12
            5.   Navy Occupation Service Medal................    8-15
            6.   Korean Service Medal.........................    8-16
            7.   Vietnam Service Medal........................    8-18
            8.   Southwest Asia Service Medal.................    8-20

Section 4.   MISCELLANEOUS .................................    8-21

   840.   Congressional Medal for Veterans of the Attack on
          Pearl Harbor.....................................    8-21
   841.   Cold War Recognition Certificate ..................    8-22

Appendix A to Chapter 8 - Requirements For 10 U.S.C. §1130
                          Recommendations ................    8-24

Chapter 9 - Foreign Gifts to U.S. Personnel

Section 1.   GENERAL.......................................    9-1

   910.   Purpose...........................................    9-1
   911.   Scope.............................................    9-1
   912.   Policy............................................    9-1
   913.   Definitions.......................................    9-2

Section 2.   FOREIGN GIFT PROCEDURES.......................    9-4

   920.   Receipt and Disposition of Gifts and Decorations....    9-4
   921.   Command Responsibilities..........................    9-8

EXHIBIT ( 15 )

c. Upgrade of Previously Approved Awards.
Reconsideration of a previously approved award requires the
presentation of new and relevant material evidence that was not
available at the time the original recommendation was
considered. Additional details regarding information that was
previously provided in the original award recommendation will
not meet the "new and relevant" requirement. If, however, new
and relevant information is available, and consideration for an
award upgrade is desired after the normal time limits have
passed, the request may be submitted through a Member of
Congress in accordance with 10 U.S.C. §1130, as noted in the
previous paragraph. A request for an award upgrade must include
the submission of a complete recommendation package in
accordance with the requirements delineated in Appendix A to
this chapter.

SECTION 2 - ADMINISTRATIVE PROCEDURES

820. AWARD INQUIRIES. To confirm eligibility for campaign and
service awards, and to obtain information regarding awards
previously received, a service record review is required.
Therefore, requests must be submitted to the command currently
maintaining the member's service record, as listed below.

1. Navy veterans discharged without further obligated
service or transferred to the Fleet Reserve or the Retired List
prior to 1 January 1996, and Marine Corps veterans discharged
without further obligated service or transferred to the Fleet
Marine Corps Reserve or the Retired List prior to 1 January
1999, may submit award inquiries to the following address:

Navy Personnel Command
Retired Records Section (PERS-312D2)
9700 Page Avenue, Room 5409
St. Louis, MO 63132-5100

2. Navy veterans discharged without further obligated
service or transferred to the Fleet Reserve or the Retired List
after 1 January 1996, may submit requests to the following
address:

Navy Personnel Command
PERS 312
5720 Integrity Drive
Millington, TN 38055-3120

3.  Marine Corps veterans discharged without further obligated service or transferred to the Fleet Marine Corps Reserve or the Retired List after 1 January 1999, may submit requests to the following address:

Headquarters, U.S. Marine Corps
Military Awards Branch (MMMA)
3280 Russell Road
Quantico, VA 22134-5103

4.  Marine Corps veterans released from active duty with further obligated service, but not in an active drilling status (e.g., Individual Ready Reserve), may submit award inquiries to the following address:

Marine Corps Mobilization Command
15303 Andrews Road
Kansas City, MO 64147-1207

5.  Include the following information in all requests, and mark the letter "For Official Use Only - Privacy Act Protected." The SF-180 form, "Request Pertaining to Military Records," may also be used and is available online at https://awards.navy.mil, the Navy Awards website.

a.  Full name, grade/rate at time of discharge.

b.  Social security number and service number (if service was before 1972).

c.  Periods of service - indicate periods of active duty/reserve duty.

d.  Date of last discharge.

e.  Organization:  ship, squadron, unit, battalion, regiment, etc., during period for which inquiry is made.

f.  Date and place of birth.

History Division
3079 Moreell Avenue
Quantico, VA 22134
http://hqinet001.hqmc.usmc.mil/HD/

Copies of documents from individual service and medical records
for members detached from the Navy prior to 1 January 1996, and
from the Marine Corps prior to 1 January 1999, may be obtained
from the National Personnel Records Center (NPRC). It is
important to provide the member's full name, service and/or
social security number, and date of birth in any correspondence
to NPRC. The correspondence shall be marked "For Official Use
Only - Privacy Act Protected."

National Personnel Records Center
Military Personnel Records
9700 Page Avenue
St. Louis, MO 63132-5100
http://www.archives.gov/st-louis/military-personnel/

SECTION 3 - AWARD REQUIREMENTS

830. GENERAL. Eligibility requirements for all personal, unit,
and campaign and service awards listed in Chapters 2, 3, and 4,
respectively, remain in effect for prior service and veteran
awards. The following sections provide supplemental guidance
for certain awards currently authorized for issue, as well as
information regarding certain awards no longer being issued.
Chapter 7 contains guidance regarding foreign awards.

831. SPECIFIC AWARD INFORMATION

1. Purple Heart Medal. The complete eligibility
requirements for the Purple Heart are contained in Chapter 2 of
this manual.

a. Type of Enemy Action. During World War I, World
War II, and the Korean War, an individual must have been wounded
as a direct result of enemy action. After 15 October 1962, an
individual who was wounded, either as a direct or indirect
result of enemy action, is eligible for the Purple Heart.

b. Time Limits. Award of the Purple Heart, unlike
other personal awards, is not subject to time limits and,

EXHIBIT ( 15 )

therefore, it is not necessary to process eligibility requests through a Member of Congress.

c. Eligibility Determinations. Personnel may apply directly to the appropriate address listed in Article 820 above for an eligibility determination based on <u>documented evidence</u> in personnel and/or medical records. A Personal Award Recommendation Form is not required.

d. If adequate documentation is not available, <u>due to the complete or partial loss of an individual's records</u>, two sworn affidavits from eyewitnesses to the injury, who were present at the time of the injury and have personal knowledge of the circumstances under which the injury occurred, may be submitted for consideration. (Statements from witnesses "after the fact" will <u>not</u> be considered.) The affidavits must be in the eyewitnesses' own words, not on a prepared form, and must be notarized. When all necessary information has been compiled, the complete package may be sent to the appropriate address:

(1) For Navy Veterans:

Chief of Naval Operations
DNS-35
2000 Navy Pentagon
Washington, DC 20350-2000

(2) For Marine Corps Veterans:

Headquarters, U.S. Marine Corps
Military Awards Branch (MMMA)
3280 Russell Road
Quantico, VA 22134-5103

2. <u>Distinguished Flying Cross and Air Medal Based on Strike/Flight Criteria</u>. The complete eligibility requirements for the Distinguished Flying Cross (DX) and Air Medal are contained in Chapter 2 of this manual.

a. Eligibility Determinations. Personnel who believe they may be eligible for a DX or Air Medal based on Strike/Flight criteria during World War II may submit an officially notarized copy of their Aviator's Flight Log Book (NAVAER-4111) to CNO or CMC, as appropriate, at the address listed in the previous paragraph. Copies of award citations for any DX or Air Medal previously awarded must be included with the

EXHIBIT ( 15 )

# APPLICATION FOR CORRECTION OF MILITARY RECORD
## UNDER THE PROVISIONS OF TITLE 10, U.S. CODE, SECTION 1552
*(Please read instructions on reverse side BEFORE completing this application.)*

OMB No. 0704-0003
OMB approval expires
Jun 30, 2009

The public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the Department of Defense, Executive Services Directorate, Information Management Division, 1155 Defense Pentagon, Washington, DC 20301-1155 (0704-0003). Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ORGANIZATION. RETURN COMPLETED FORM TO THE APPROPRIATE ADDRESS ON THE BACK OF THIS PAGE.**

## PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 US Code 1552, EO 9397.

**ROUTINE USE(S):** None.

**PRINCIPAL PURPOSE:** To initiate an application for correction of military record. The form is used by Board members for review of pertinent information in making a determination of relief through correction of a military record.

**DISCLOSURE:** Voluntary; however, failure to provide identifying information may impede processing of this application. The request for Social Security number is strictly to assure proper identification of the individual and appropriate records.

**1. APPLICANT DATA** *(The person whose record you are requesting to be corrected.)*

| a. BRANCH OF SERVICE (X one) | ARMY | NAVY | AIR FORCE | X | MARINE CORPS | COAST GUARD |
|---|---|---|---|---|---|---|

| b. NAME (Print - Last, First, Middle Initial) | c. PRESENT OR LAST PAY GRADE | d. SERVICE NUMBER (if applicable) | e. SSN |
|---|---|---|---|
| ROGERS VICTOR JOHN | E-2/PFC | 575906 | 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 |

| 2. PRESENT STATUS WITH RESPECT TO THE ARMED SERVICES *(Active Duty, Reserve, National Guard, Retired, Discharged, Deceased)* | 3. TYPE OF DISCHARGE *(If by court-martial, state the type of court.)* | 4. DATE OF DISCHARGE OR RELEASE FROM ACTIVE DUTY *(YYYYMMDD)* |
|---|---|---|
| DISCHARGED | HONORABLE | 19451026 |

**5. I REQUEST THE FOLLOWING ERROR OR INJUSTICE IN THE RECORD BE CORRECTED:** *(Entry required)*
THAT MY RECORD REFLECT I WAS WOUNDED DUE TO ENEMY ACTION BY SHELL CONCUSSION AND THAT I THEREFORE AM RECOGNIZED AS HAVING EARNED THE PURPLE HEART.

**6. I BELIEVE THE RECORD TO BE IN ERROR OR UNJUST FOR THE FOLLOWING REASONS:** *(Entry required)*
AS FURTHER DISCUSSED IN THE ATTACHED AFFIDAVIT, THE EVIDENCE SHOWS I RECEIVED A SEVERE CONCUSSION WHILE FIGHTING ON PELELIU ISLAND, THOUGH IT IS CIRCUMSTANTIAL BECAUSE OF THE CONFUSED RECORDS I HAVE ENCLOSED.

**7. ORGANIZATION AND APPROXIMATE DATE** *(YYYYMMDD)* **AT THE TIME THE ALLEGED ERROR OR INJUSTICE IN THE RECORD OCCURRED** *(Entry required)*  FIRST BATTALION, SEVENTH MARINES, FIRST MARINE DIVISION

**8. DISCOVERY OF ALLEGED ERROR OR INJUSTICE**

| a. DATE OF DISCOVERY *(YYYYMMDD)* | b. IF MORE THAN THREE YEARS SINCE THE ALLEGED ERROR OR INJUSTICE WAS DISCOVERED, STATE WHY THE BOARD SHOULD FIND IT IN THE INTEREST OF JUSTICE TO CONSIDER THE APPLICATION. |
|---|---|
| 20050801 | THIS IS REQUEST FOR REVIEW AND RECONSIDERATION. A FORMER JUDGE ADVOCATE WHO HAS WORKED WITH BCNR BELIEVES THE RECORD SUPPORTS A PURPLE HEART. |

**9. IN SUPPORT OF THIS APPLICATION, I SUBMIT AS EVIDENCE THE FOLLOWING ATTACHED DOCUMENTS:** *(If military documents or medical records are pertinent to your case, please send copies. If Veterans Affairs records are pertinent, give regional office location and claim number.)*
AFFIDAVIT WITH ENCLOSURES

**10. I DESIRE TO APPEAR BEFORE THE BOARD IN WASHINGTON, D.C.** *(At no expense to the Government) (X one)*

| | YES. THE BOARD WILL DETERMINE IF WARRANTED. | X | NO. CONSIDER MY APPLICATION BASED ON RECORDS AND EVIDENCE. |
|---|---|---|---|

| 11.a. COUNSEL (If any) NAME (Last, First, Middle Initial) and ADDRESS (Include ZIP Code) | b. TELEPHONE (Include Area Code) 760-885-9984 |
|---|---|
| THORNLEY, DONALD J. 20919 STANDING ROCK AVENUE APPLE VALLEY, CA 92307 | c. E-MAIL ADDRESS donald.thornley@yahoo.com  760-577-6791  961-1595 |
| | d. FAX NUMBER (Include Area Code) |

**12. APPLICANT MUST SIGN IN ITEM 15 BELOW. If the record in question is that of a deceased or incompetent person, LEGAL PROOF OF DEATH OR INCOMPETENCY MUST ACCOMPANY THE APPLICATION. If the application is signed by other than the applicant, indicate the name** *(print)* **and relationship by marking one box below.**

| SPOUSE | WIDOW | WIDOWER | NEXT OF KIN | LEGAL REPRESENTATIVE | OTHER (Specify) |
|---|---|---|---|---|---|

| 13.a. COMPLETE CURRENT ADDRESS (Include ZIP Code) OF APPLICANT OR PERSON IN ITEM 12 ABOVE (Forward notification of all changes of address.) | b. TELEPHONE (Include Area Code) 760-955-5569 |
|---|---|
| 14016 GOPHER CANYON ROAD VICTORVILLE, CA 92394 | c. E-MAIL ADDRESS N/A |
| | d. FAX NUMBER (Include Area Code) N/A |

**14. I MAKE THE FOREGOING STATEMENTS, AS PART OF MY CLAIM, WITH FULL KNOWLEDGE OF THE PENALTIES INVOLVED FOR WILLFULLY MAKING A FALSE STATEMENT OR CLAIM.** *(U.S. Code, Title 18, Sections 287 and 1001, provide that an individual shall be fined under this title or imprisoned not more than 5 years, or both.)*

CASE NUMBER *(Do not write in this space.)*

| 15. SIGNATURE (Applicant must sign here.) | 16. DATE SIGNED *(YYYYMMDD)* |
|---|---|

**DD FORM 149, SEP 2007**      PREVIOUS EDITION IS OBSOLETE.

EXHIBIT ( 16 )

Adobe Designer 7.0

# INSTRUCTIONS

1. All information should be typed or printed. Complete all applicable items. If the item is not applicable, enter "None."

2. If space is insufficient on the front of the form, use the "Remarks" box below for additional information or attach an additional sheet.

3. List all attachments and enclosures in item 9. Do not send original documents. Send clear, legible copies. Send copies of military documents and orders related to your request, if you have them available. Do not assume that they are all in your military record.

4. The applicant must exhaust all administrative remedies, such as corrective procedures and appeals provided in regulations, before applying to the Board of Corrections.

5. ITEM 5. State the specific correction of record desired. If possible, identify exactly what document or information in your record you believe to be erroneous or unjust and indicate what correction you want made to the document or information.

6. ITEM 6. In order to justify correction of a military record, it is necessary for you to show to the satisfaction of the Board by the evidence that you supply, or it must otherwise satisfactorily appear in the record, that the alleged entry or omission in the record was in error or unjust. Evidence, in addition to documents, may include affidavits or signed testimony of witnesses, executed under oath, and a brief of arguments supporting the application. All evidence not already included in your record must be submitted by you. The responsibility of securing evidence rests with you.

7. ITEM 8. U.S. Code, Title 10, Section 1552b, provides that no correction may be made unless a request is made within three years after the discovery of the error or injustice, but that the Board may excuse failure to file within three years after discovery if it finds it to be in the interest of justice.

8. ITEM 10. Personal appearance before the Board by you and your witnesses or representation by counsel is not required to ensure full and impartial consideration of your application. If the Board determines that a personal appearance is warranted and grants approval, appearance and representation are permitted before the Board at no expense to the government.

9. ITEM 11. Various veterans and service organizations furnish counsel without charge. These organizations prefer that arrangements for representation be made through local posts or chapters.

10. ITEM 12. The person whose record correction is being requested must sign the application. If that person is deceased or incompetent to sign, the application may be signed by a spouse, widow, widower, next of kin (son, daughter, mother, father, brother, or sister), or a legal representative that has been given power of attorney. Other persons may be authorized to sign for the applicant. Proof of death, incompetency, or power of attorney must accompany the application. Former spouses may apply in cases of Survivor Benefit Plan (SBP) issues.

11. For detailed information on application and Board procedures, see: Army Regulation 15-185 and www.arba.army.pentagon.mil; Navy - SECNAVINST.5420.193 and www.hq.navy.mil/bcnr/bcnr.htm; Air Force Instruction 36-2603, Air Force Pamphlet 36-2607, and www.afpc.randolph.af.mil/safmrbr; Coast Guard - Code of Federal Regulations, Title 33, Part 52.

## MAIL COMPLETED APPLICATIONS TO APPROPRIATE ADDRESS BELOW

| ARMY | NAVY AND MARINE CORPS |
|---|---|
| **(For Active Duty Personnel)**<br>Army Board for Correction of Military Records<br>1901 South Bell Street, 2nd Floor<br>Arlington, VA 22202-4508<br><br>**(For Other than Active Duty Personnel)**<br>Army Review Boards Agency<br>Support Division, St. Louis<br>9700 Page Avenue<br>St. Louis, MO 63132-5200 | Board for Correction of Naval Records<br>2 Navy Annex<br>Washington, DC 20370-5100 |

| AIR FORCE | COAST GUARD |
|---|---|
| Board for Correction of Air Force Records<br>SAF/MRBR<br>550-C Street West, Suite 40<br>Randolph AFB, TX 78150-4742 | Board for Correction of Military Records<br>245 Murray Lane<br>Room 5126, Mail Stop #0900<br>Washington, DC 20528 |

**17. REMARKS**

EXHIBIT ( 16 )



CRS
Docket No: 8785-08
1 October 2008

MR VICTOR J ROGERS
14016 GOPHER CANYON ROAD
VICTORVILLE CA 92394

Dear Mr. Rogers:

This is in reference to your request for further consideration of
your application for correction of your naval record pursuant to
the provisions of title 10 of the United States Code section
1552.

A three-member panel of the Board for Correction of Naval
Records, sitting in executive session, reconsidered your
application on 10 September 2008. Your allegations of error and
injustice were reviewed in accordance with administrative
regulations and procedures applicable to the proceedings of this
Board. Documentary material considered by the Board consisted of
your application, together with all material submitted in support
thereof, your naval record and applicable statutes, regulations
and policies.

After careful and conscientious consideration of the entire
record, the Board found that the evidence submitted was
insufficient to establish the existence of probable material
error or injustice.

The Board found that you enlisted in the Marine Corps Reserve on
9 September 1943. On or about 15 September 1944, during the
Battle of Peleliu, your best friend was killed by sniper fire.
In your own words, you became hysterical upon his death, and were
sent to the nearest aid station. You did not turn yourself in
for treatment at the aid station, but returned to your unit.
Several days later, your commanding officer told you to return to
the aid station, and you returned to the aid station on 18
September 1944. A pre-printed medical form that was completed on
that date contains the printed words "Wounded in action", as well
as the typewritten words "HEAT EXHAUSTION". A medical history
form which covers the 18-24 September 1944 period, when you were
assigned to the USS Leedstown for treatment and disposition,
indicates that you were injured while engaged in the invasion and
occupation of "Palau". It is noteworthy that the word "injured"
was substituted for "wounded" on the prepared form. You reported
feeling feverish and nauseated, and were given a diagnosis of
heat exhaustion. You were treated with salt tablets, forced
fluids and bed rest, and ultimately returned to duty on 24
September 1944. There is no mention of a concussion or blast
injury in either of those medical entries.

EXHIBIT ( 17 )

A medical history entry dated 17 May 1945 indicates that you arrived onboard the U.S.S. Samaritan on that date with a diagnosis of "FATIGUE, COMBAT". An entry dated 29 July 1945 confirms the diagnosis of combat fatigue, and states, in part, "Peleliu for 3 days-not injured. Okinawa for 47 days, not physically injured" (emphasis added), and "Knocked down by large explosion at some distance, knocked down but not unconscious. No serious complaints now". On 11 September 1945, a board of medical survey determined that you were unfit for further service due to "Psychoneurosis Otherwise Unclassified", which was incurred in the line of duty. You were honorably discharged from the Navy on 26 October 1945, pursuant to the approved findings and recommendation of the board of medical survey. The honorable discharge certificate you were issued on that date, which you signed and to which you affixed the print of your right index finger, contains the following entry:: "Wounds received in service: None". The certificate also shows that you were awarded the Honorable Service Lapel Button. It does not show that you were awarded the Purple Heart.

The Board was not persuaded that you suffered a significant blast injury/concussion while engaged in combat on Peleliu Island in 1944. The Board noted that in order to qualify for the award of a Purple Heart, a service member must sustain an injury that requires treatment by a medical officer at the time the injury occurred. The belated entry in your record concerning a "concussion reaction" was not made at the time of the alleged injury, and there is no indication in the record that you required treatment by a medical officer at the time the alleged injury occurred. The newspaper article and picture of yourself you submitted in support of your application do not establish that you were wounded in action. The pre-printed medical record entry dated 18 September 1944 is of no probative value, as a typewritten entry was added to the form to show that you were suffering from heat exhaustion, rather than a wound. The medical history entry dated 24 September 1944, which also appears to be a pre-prepared form, is more explicit. The word "wounded" was crossed out, "injured" was substituted, and a diagnosis of heat exhaustion was added to the prepared form. It is likely that numerous copies of each of those forms were prepared in anticipation of heavy casualties, and that the copies of the forms filed in your record were tailored to reflect that you suffered a heat injury rather than a wound. The medical record entry dated 29 July 1945 suggests that you reported that you had not been injured while serving on Peleliu, and that there was no evidence to the contrary in your record. The report of the board of medical survey which found you unfit for duty does not indicate that you were wounded in action, and you did not submit a statement in rebuttal thereto, despite being given the

EXHIBIT ( 17 )

opportunity to do so.

In view of the foregoing, your application has been denied. The names and votes of the members of the panel will be furnished upon request.

It is regretted that the circumstances of your case are such that favorable action cannot be taken. You are entitled to have the Board reconsider its decision upon submission of new and material evidence or other matter not previously considered by the Board. In this regard, it is important to keep in mind that a presumption of regularity attaches to all official records. Consequently, when applying for a correction of an official naval record, the burden is on the applicant to demonstrate the existence of probable material error or injustice.

Sincerely,

W. DEAN PFEIFFER
Executive Director

17

EXPEDITIONS, ENGAGEMENTS, DISTINGUISHED SERVICE

In the Field    8 APR 1944

From in the Field    14 Jul 1945

16-9547

MEDALS (including good-conduct medals and bars, but excluding those awarded for qualification with infantry weapons), BADGES, AND DECORATIONS; MEDAL OR
BADGE NUMBER AND DATE AWARDED

LETTERS OF COMMENDATION (Pasted on page 23)

| Subject | Date | By Whom Issued |
|---|---|---|
|  |  |  |

EXHIBIT ( 10 )

# MEDICAL HISTORY

ROGERS
(Surname)

Victor   John
(Christian name(s))

Born: Place _____   Date _____

STATE NAME OF PLACE   DATE EACH NEW ENTRY

U.S.N. HOSPITAL, NEWPORT, R.I.

FT DATE: 7-29-45

DIAGNOSIS:   FATIGUE COMBAT #2172

NOT DUE TO MISCONDUCT.

TEST WRITER:

Patient is 19 year old Pfc,
USMCR, with 2 years service
(17 months overseas. Peleliu
for 3 days— not injured. Okinawa
for 47 days, not physically injured
"Dreams and a little nervous"
for 3 months. Combat dreams
about once in two weeks, restless,
no marked sweating, constant
hand tremor present. Mixes
well and not irritable. Head-
aches once a week, supraorbital,
last a day each, relieved by as-
pirin. Knocked down by large
explosion at some distance,
knocked down but not unconscious.
No serious complaints now. Alw-
ays mixed well, no enuresis;
somnambulism to 9 years of age,
used to bite his nails..
FH: Parents living and well.
1 brother, 1 sister living and
well.
Education 10th grade at 17, did
rather poorly. Truanted
frequently.
Occupation- Lathe operator for
7 months.
Marital- Patient is single.
Fairly normal sexual interests.
Medical: No serious illness.

16-0917

EXHIBIT (19)

*[handwritten at top left:]* Base Center, 5-17-45
Recommend for duty ... ?
X Rogers

**(continued)**

He developed a feeling of nau-
sea, headache, and an overwhelm-
ing feeling of fatigue. Finally
he culd carry on no longer and
was again returned to his com-
manding officer to sick bay.
Mental Status: The pt. is not a
true psychotic. He is nervous,
startled by gun fire, and has
wept several times at the thought
of his buddy's death. He admits
to homesickness. He has had no
combat dreams, but has been trou-
bled with sleeplessness the last
few nights. When asked why he
thinks he feels this way he
states "I just can't see it". He
feels that since he convinced
his buddy to become a runner a-
long with him, in fact, even ar-
ranged for it, that he is res-
ponsible for his buddy's death.
His somatic symptoms of fatigue,
nausea, and anorexia are un-
doubtedly neurotic pre-occupa-
tions. He has complete memory
for everything that has happened.
5-17-45: Transferred this date
to DESTINATION UNKNOWN.

D.G. SONNEBORN,
Lt.(jg)MC-USNR.

APPROVED:

W.H. HANNA,
Lt. MC-USNR.

---

ROGERS

Victor                    John

N. Y.                    9-19-25

Pfc.           545906           USMCR
White          Enl. 6-27-43
Co. A, 1st Bn., 7th Mar.
CO. A, III CORPS MEDICAL BN.,
III PHIB CORPS IN THE FIELD.
RA 5-15-45: FATIGUE, Combat (2170)
DNEPTE. Not result of own mis-
conduct.

This pt. is a Pfc. in the Mar-
ine Corps, age 19, single, Cath-
olic, with 23 months in the ser-
vice, 14 of which have been
spent overseas. He has been in
two campaigns, Peliliu and Oki-
nawa, participating as a "run-
ner" or message-carrier. His
job is to carry messages back
to the C.P. whenever his out-
fit gets pinned down by enemy
fire.

The incident which precipitated
his difficulty was seeing his
best buddy, also a runner, shot
and killed by a sniper while
trying to get a message through.
The patient was supposed to
have carried the message himself
but because he did not have on
his packet at the time his "bu-
ddy" was sent. At the sight of
his friend's death, the pt. be-
came somewhat hysterical and
began to cry. He was sent to
the Aid Station along with
some wounded but did not turn
in. He returned to his post for
3 days, but the weight of the
situation preyed on his mind.
**(continued)**

EXHIBIT ( 20 )